[Civ. No. 20517. Fourth Dist., Div. Two. Oct. 23, 1979.]

BARBARA DRETZKA MOLAR, Plaintiff and Respondent, v.
BRAD GATES, as Sheriff, etc., et al., Defendants and Appellants.

COUNSEL

Adrian Kuyper, County Counsel, and Arthur C. Wahlstedt, Jr., Assistant County Counsel, for Defendants and Appellants.

Lawrence Buckley and Donald J. Hobson for Plaintiff and Respondent.

OPINION

**TAMURA, J.**—This appeal involves the constitutionality of the policy and practices pursued by the Sheriff and Board of Supervisors of Orange County of providing minimum security jail facilities with their attendant privileges, including outside work assignments, for male prisoners while denying such facilities and privileges to female inmates. The trial court decided that the practice was violative of the equal protection clauses of the state as well as the federal Constitutions and directed issuance of a peremptory writ of mandate commanding the sheriff and the board of supervisors (defendants) to end the discriminatory treatment of female inmates. Defendants appeal from the judgment.

Plaintiff, a female inmate serving a one-year sentence in the county jail, filed a petition for writ of mandate on behalf of herself and all other women who are now or in the future will be sentenced to the Orange County jail to require defendants (1) to permit female inmates to be housed and detained at minimum security branch jails now used exclusively to house male inmates; (2) to apply the same criteria to female applicants as are applied to male applicants in determining their eligibility for such housing; (3) to house female inmates who are eligible for minimum security detention at the minimum security branch jails; and (4) to permit female inmates housed at branch facilities to apply for, and be assigned to, available jobs on the same basis and under the same circumstances as male inmates. The court certified the suit as a proper class action and ordered defendants to show cause why the relief sought in the petition should not be granted.

Defendants answered and the matter was heard and submitted on the pleadings and oral and documentary evidence. The evidence reveals the following facts about the correctional facilities maintained by Orange County:

All incarcerated females are housed in the women's jail located in downtown Santa Ana. The building, first occupied in 1968, is a concrete and steel structure with opaque windows so that inmates cannot see out. The inmates sleep in dorms designed to hold 15 prisoners. When not sleeping or working, they may use adjacent day rooms furnished with television, radios, books, magazines, box games and puzzles. They are permitted to see a movie once a week. Outdoor recreation is available 4 hours per week on the roof of the jail in an area approximately 33 feet square. Inmates are permitted to make telephone calls during the recreation periods. Inmates may have visitors five days per week in half hour increments but they are separated from their visitors by a glass partition so that they cannot hold infants or otherwise touch their guests.

The daily count of female inmates averages 124. The number of sentenced women averages 68 per day and the average number of unsentenced women is 42. In 1977, 2,111 women were sentenced to the Orange County jail. Among sentenced women, two to ten may be serving on a work furlough program at any one time; the average number of women on work furlough at a given time is two or three.[1] All other sentenced inmates, except those who are ill or refuse to work, perform jobs in the jail facility. Some unsentenced inmates also work, though they are not required to do so. The jobs for the women consist of washing and ironing, cooking, stocking food shelves and serving food, cleaning the kitchen area, mopping and waxing floors, cleaning windows, collecting trash, sewing and mending clothes for male inmates, making mattress covers for the jail system, and serving as beauty operators. Approximately 57 inmates are utilized in these tasks on a daily basis and a minimum of 35 women are needed to carry out these programs.

Approximately 10 times as many men as women are sentenced to jail in Orange County each year. The men serve their sentences in one of three jail facilities maintained by the county—the main men's jail, the Theo Lacy Branch jail, and the James A. Musick Branch jail. The main men's jail is a concrete and steel structure in downtown Santa Ana housing approximately 1,000 inmates. Conditions at the men's main jail were found to be "more onerous" than those of the women's jail. About 45 percent of all males sentenced to jail serve their time at one of the branch jails.

---

[1] Inmates on work furlough go outside the jail to work at a civilian job during the day and return in the evening.

The Theo Lacy Branch jail (the Lacy facility) is a minimum security facility located near the UCI Medical Center. It is designed to house 400 inmates. Its average daily count on weekdays is approximately 233; on weekends the influx of those serving weekend sentences brings it close to capacity. The facility consists of an eight-acre campus surrounded by a chain link fence. Inmates are housed in unlocked barracks which provide little privacy, since both guards and prisoners can see into the barracks and toilet facilities. The campus has a library, mess hall, various shops, a central guard station, an athletic field, a handball court, basketball hoop, and horse shoe pitches. Inmates are permitted to move freely about the compound or utilize the athletic areas during daylight hours when they are not working. There are no telephones for inmates but there is one movie night each week and one television is available for inmates' viewing. Inmates may have visitors for one hour on both Saturday and Sunday and are allowed to shake hands with or kiss their visitors as well as to hold children.

All of the inmates at the Lacy facility are either on work furlough or assigned to jobs within the jail system. Of those men assigned jail system jobs, approximately 31 percent work on the Lacy facility campus; they cook, clean and maintain the yard, clean and polish floors, do minor repairs in the living quarters, barber, launder and mark clothes. About 59 percent of the men have work assignments off campus; they are assigned to the county animal shelter, county service station, environmental management agency, sheriff's department, road department, county transportation, and the forestry division. Their work is supervised by a civilian work crew supervisor, usually an employee of the agency to which the men are assigned.

The James A. Musick Branch jail (the Musick facility) with a capacity of 200 inmates and currently housing approximately 100 men, is located in a rural area of the county. The facility consists of a 100-acre farm surrounded by a chain link fence topped with barbed wire. All of the men assigned to Musick, except for a small crew, work on the compound; they raise crops, poultry, and livestock, and do the cooking and maintenance work for the facility. The men live in barracks with high windows; the barracks are locked from the outside after 10 o'clock at night. The men may use the athletic field and handball court after work during daylight hours, and can move freely about the acre-and-one-half inner compound after dark. Inmates are allowed a one-hour visit on both Saturday and Sunday; they may shake hands or kiss their guest

and hold infants. Once a month, each inmate is permitted a two-hour picnic with visitors in the compound. Once a week there is a movie night; there is a library and there are two televisions for inmates. Inmates do not have telephone privileges.

The court found that inmates assigned to the branch jails undergo substantially less onerous and restrictive confinement than those confined in the main jails; that defendants have pursued the policy and practice of providing minimum security branch jail facilities and related outdoor work programs only for male inmates and intend to continue that policy and practice unless the law requires them to do otherwise and that by virtue of defendants' policy, female inmates are required to serve their time in the maximum security main jail without being afforded the opportunity for assignment to minimum security facilities and related outdoor work assignments regardless of whether they meet the criteria applied to male inmates in making assignments to such facilities and programs. The court further found that it was untrue that the gender classification established by defendants was necessary to carry out either their duty to protect inmates from each other or their duty not to permit females to sleep, dress or undress, bathe or perform eliminatory functions in the same room with male inmates.

The court concluded that women inmates as a class were denied the equal protection of the law mandated by the California and United States Constitutions in that the reasons put forward by defendants to justify the policy and practice of providing minimum security facilities and related work programs and privileges only for men met neither the "compelling state interest" test required by the California Constitution nor the "important governmental interest" test required by the federal Constitution.[2]

Although the court concluded that defendants' policy and practice constituted invidious sex discrimination in violation of the equal protection clauses of the state and federal Constitutions, it decided that since defendants were not under a legal duty to provide minimum security facilities and related privileges to any prisoner, it would be inappropriate to grant relief in the form requested by plaintiff. In his memorandum of intended decision, the judge stated that "the determination of the kind of facilities and programs to be provided for county jail inmates, within

[2]The court's findings of fact and conclusions of law are in accordance with its thoughtful and comprehensive memorandum of intended decision.

budgetary constraints, is best determined by the legislative and executive officials of the County. Their constitutional duty is to not make an invidious discrimination against female inmates as a class when making such facilities and programs available." Consequently, the court directed that a judgment be entered for the issuance of a peremptory writ of mandate commanding defendants to "(1) end the practice of failing to provide minimum-security branch jail facilities and related work programs for female county jail inmates while providing such facilities and programs for male inmates; and (2) end the practice of denying to inmates all opportunity for assignment to such facilities and programs on the basis of the inmates' sex; and (3) apply similar criteria to all inmates, regardless of sex, in determining eligibility for and in making assignments to such facilities and programs, except that nothing herein shall require the confinement of male and female inmates in the same facility or the joint participation of male and female prisoners in any program." Judgment was entered accordingly.

Defendants appeal contending that the practice of providing minimum security facilities and their attendant advantageous programs only to male inmates does not offend the equal protection clause of the state or federal Constitutions. They argue that the trial court erred in using the strict scrutiny test in assessing the validity of the disparate treatment of female prisoners and further, that even under the most rigorous standard of review, there are compelling state interests which justify the difference in treatment. Next, defendants contend that Penal Code sections 4002, 4021, and 4029 legislate complete separation of men and women in county jail facilities and also legislate equal treatment of men and women only upon receipt of funds allocated by the Legislature and that since the trial court did not find these statutes unconstitutional its order for equal protection should have been deferred until the Legislature implements these statutes.[3] Defendants also contend that the

---

[3]Penal Code section 4002 provides: "Persons committed on criminal process and detained for trial, persons convicted and under sentence, and persons committed upon civil process, must not be kept or put in the same room, nor shall male and female prisoners (except husband and wife) sleep, dress or undress, bathe, or perform eliminatory functions in the same room. Nothing in the section shall be construed to impose any requirement upon a county to confine male and female prisoners in the same or an adjoining facility or impose any duty upon a county to establish or maintain programs which involve the joint participation of male and female prisoners."

Penal Code section 4021 provides: "Whenever any female prisoner or prisoners are confined in any county jail in the state, and no regular jail female deputy sheriff has been appointed, there shall be designated by the sheriff some suitable woman who shall have immediate care of such female prisoner or prisoners, and who shall be paid out of

mandate of the court is void for vagueness, ambiguity and unintelligibility. For reasons explained below, we have determined that the trial court correctly analyzed and resolved the equal protection challenge under the state and federal Constitutions to the disparate treatment of female inmates of the county jail and that the court's mandate is not void for vagueness, ambiguity or unintelligibility. Accordingly, we have concluded that the judgment should be affirmed.

---

the general fund of the county upon claims to be presented and allowed by the board of supervisors as other claims against the county. It shall be unlawful for any officer or jailer to search the person of any prisoner of the opposite sex, or to enter into the room or cell occupied by any prisoner of the opposite sex, except in the company of a deputy sheriff of the same sex as the prisoner."

Penal Code section 4029 provides: "(a) Whenever within any county adult detention facility or part of any county detention facility used for the confinement of adults, not including any city jail, any facility, including but not limited to any room or cell, vocational training facility, recreation area, rest area, dining room, store, or facility for the exercise of religious freedom, is provided for use by any prisoner for any purpose, a separate facility of equal quality, or separate use of the same facility, or joint use of the same facility where appropriate, shall be provided for prisoners of the opposite sex for such purpose.

"(b) Whenever within any county adult detention facility or part of any county detention facility used for the confinement of adults, not including any city jail, any program, service or privilege, including but not limited to any general or vocational education, physical education or recreation, work furlough program, psychological counseling, work within the institution, visiting privileges, or medical treatment, is provided for any prisoner, such a program, service or privilege of equal quality shall be provided for prisoners of the opposite sex, except when the proportion of prisoners of one sex is so small that the cost of providing any program, service or privilege described in this subdivision, other than medical treatment or health maintenance, for such prisoners would not be justified in relation to the reduction in the level of any other program, service or privilege that would result from the diversion of funds for such purpose.

"(c) Nothing in this section shall require the establishment of any facility for the use of, or the making available of any program, service or privilege to, any prisoner. Nothing in this section shall require any facility, program, service or privilege established or available prior or subsequent to the effective date of this section to be made available to any particular male or female prisoner or number of such prisoners, except that any type of facility, program, service or privilege which is made accessible or available to all male or female prisoners in any class defined by subdivisions 1, 2, and 3 of Section 4001 shall be made accessible or available to all prisoners of the opposite sex in such class as provided in subdivisions (a) and (b), and any criterion other than the sex of the prisoner which is used for the selection of a particular prisoner or group of prisoners to have, or to have access to, any facility, program, service or privilege shall be equally applied to the selection of all prisoners, regardless of sex.

"(d) Every county shall comply with subdivisions (a), (b), and (c) by January 1, 1979. Such compliance shall not be required unless the Legislature provides funds to assist in the accomplishment of such compliance. Every county shall report to the Legislature by January 1, 1976, as to whether such compliance can be accomplished, and stating the reasons why it cannot be accomplished if that be the case."

## I
### CONSTITUTIONALITY OF DIFFERENTIAL TREATMENT OF MEN AND WOMEN IN THE ORANGE COUNTY JAIL SYSTEM

■ In a given case the equal protection provisions of our state Constitution "demand an analysis different from that which would obtain if only the [Fourteenth Amendment] were applicable." (*Serrano v. Priest,* 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929].) This is such a case because it involves a classification based upon gender, to which California courts have applied a standard of review different from that applied by the federal courts under the Fourteenth Amendment. Accordingly, in the ensuing discussion we analyze separately plaintiff's equal protection claims under the state and federal Constitutions.[4]

### 1. *Equal Protection Under the California Constitution*

■ We start with the proposition that equal protection provisions of the California Constitution are "possessed of an independent validity" from the Fourteenth Amendment so that a decision based upon a determination that the equal protection guaranteed by the state Constitution has been violated will stand on the state ground alone.[5] (*Gay Law Students Assn. v. Pacific Tel. & Tel. Co.,* 24 Cal.3d 458, 469 [156 Cal. Rptr. 14, 595 P.2d 592]; *Serrano v. Priest (Serrano II), supra,* 18 Cal. 3d 728, 764; *Dept. of Mental Hygiene v. Kirchner (Kirchner II),* 62 Cal.2d 586, 588 [43 Cal.Rptr. 329, 400 P.2d 321, 20 A.L.R.3d 361]; see note, *Camping on Adequate State Grounds: California Ensures the Reality of Constitutional Ideals* (1977) 9 Sw.U.L.Rev. 1157.)

---

[4]Both the federal and state courts hold that prisoners do not lose their right to equal protection of the laws upon incarceration. (See *Wolff v. McDonnell,* 418 U.S. 539, 556 [41 L.Ed.2d 935, 950-951, 94 S.Ct. 2963]; *Jackson v. Godwin,* 400 F.2d 529, 541-542; *Washington v. Lee,* 263 F.Supp. 327, 331, affd. 390 U.S. 333 [19 L.Ed.2d 1212, 88 S.Ct. 994]; *In re Kapperman,* 11 Cal.3d 542 [114 Cal.Rptr. 97, 522 P.2d 657]; *In re Jones,* 57 Cal.2d 860, 862 [22 Cal.Rptr. 478, 372 P.2d 310]; *In re Hutchinson,* 23 Cal.App.3d 337, 341 [100 Cal.Rptr. 124]; *Denial of Work Release Programs to Women: A Violation of Equal Protection* (1974) 47 So.Cal.L.Rev. 1453, 1462-1463, fn. 68.)

[5]Article I, section 7 of the California Constitution provides: "(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws.

"(b) A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. Privileges or immunities granted by the Legislature may be altered or revoked."

Article IV, section 16, subdivision (a), of the California Constitution provides: "(a) All laws of a general nature have uniform operation."

In evaluating legislative classifications under this state's equal protection provisions, our Supreme Court has adopted the traditional two-level standard of review. (*Hawkins* v. *Superior Court,* 22 Cal.3d 584, 592 [150 Cal.Rptr. 435, 586 P.2d 916]; *Serrano* v. *Priest,* 5 Cal. 3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 124]; *Sail'er Inn, Inc.* v. *Kirby,* 5 Cal.3d 1, 16 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; see *Arp* v. *Workers' Comp. Appeals Bd.,* 19 Cal.3d 395 [138 Cal.Rptr. 293, 563 P.2d 849]; *Westbrook* v. *Mihaly,* 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487]; *Purdy & Fitzpatrick* v. *State of California,* 71 Cal.2d 566, 578-579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) Under this bifurcated standard, classifications in the area of economic regulation are presumed to be constitutional, and will stand if they bear some rational relationship to a conceivable legitimate state purpose. Distinctions involving "suspect classifications" or "fundamental interests," however, demand the active and critical analysis referred to as "strict scrutiny." Under strict scrutiny, the state must show both that it has a *compelling interest* which justifies the classification and that the classification is *necessary* to further that compelling interest. (*Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, 784-785.)

In *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1, a female citizen challenged the constitutionality of a California law prohibiting women from tending bar unless they or their husbands held the liquor license on equal protection grounds. Our Supreme Court held that the bartending law was indeed unconstitutional under the equal protection clauses of the state and federal Constitutions and in doing so declared that "classifications based upon sex should be treated as suspect." (*Id.,* at p. 17.)

*Sail'er Inn* thus clearly established the principle that gender-based differentials are to be treated as "suspect classifications" which must be subjected to intense judicial scrutiny to determine if they violate the right to equal protection guaranteed by the state Constitution. (*Id.,* at pp. 17-20.) The Supreme Court has consistently reaffirmed this principle. Thus, in *Arp* v. *Workers Comp. Appeals Bd., supra,* 19 Cal.3d 395, 400, the court stated that "the strict scrutiny/compelling state interest test must govern sex discrimination challenges under article I, section 7, of the California Constitution," and in *Hardy* v. *Stumpf,* 21 Cal.3d 1, 7 [145 Cal.Rptr. 176, 576 P.2d 1342], the court acknowledged that "[c]lassifications predicated on gender are deemed suspect in California."

Defendants argue, nevertheless, that strict scrutiny does not apply in gender discrimination cases in California unless there is also a fundamental right or interest involved. To support this argument, they cite the following language of *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1, 20: "We conclude that the sexual classifications are properly treated as suspect, particularly when those classifications are made with respect to a fundamental interest such as employment."

■ In both federal and California cases involving classifications other than sex, the courts have consistently stated that if a classification involves either a suspect classification *or* a fundamental interest, strict scrutiny must be applied. (E.g., *Shapiro* v. *Thompson,* 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322]; *Harper* v. *Virginia State Board of Elections,* 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079]; *Korematsu* v. *United States,* 323 U.S. 214 [89 L.Ed. 194, 65 S.Ct. 193]; *Serrano* v. *Priest (Serrano II), supra,* 18 Cal.3d 728, 761; *Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, 784-785; *Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 578-579; see Bice, *Standards of Judicial Review under the Equal Protection and Due Process Clauses* (1977) 50 So.Cal.L.Rev. 689, 693-698; Tribe, *Sex Discrimination and Equal Protection: Do We Need A Constitutional Amendment?* (1971) 84 Harv.L.Rev. 1499, 1503.) In its *Sail'er Inn* pronouncement that sex-based classifications are "suspect," the California Supreme Court reiterated this disjunctive language, though it also said that the gender discrimination with which it dealt involved a fundamental right as well.[6] (*Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1, 16-17.) In *D'Amico* v. *Board of Medical Examiners,* 11 Cal.3d 1, 18 [112 Cal.Rptr. 786, 520 P.2d 10], the court dispelled any doubt that *Sail'er Inn* established the proposition that sex-based discrimination in and of itself is the basis for strict scrutiny. The court emphasized: "The fundamental thrust of *Sail'er Inn* is against discrimination on the basis of sex, a classification which is clearly 'suspect' and therefore subject *on that basis* to review under the 'strict scrutiny' test." (Italics added.) And in its most recent

[6]On the federal level the stricter standard of review has not been reserved only for cases in which gender-based classifications are linked with rights which approach the fundamental level. This is illustrated by *Craig* v. *Boren,* 429 U.S. 190 [50 L.Ed.2d 397, 97 S.Ct. 451], and *Reed* v. *Reed,* 404 U.S. 71 [30 L.Ed.2d 225, 92 S.Ct. 251]. As discussed in the text below, the United States Supreme Court brought to bear a stricter analysis than the "rational basis" test in these cases, yet *Reed* dealt with whether a woman may be passed over as an administrator of an estate in favor of a man, while *Craig* decides the less than weighty issue of whether teenage boys can be barred from purchasing beer while their female counterparts of the same age are allowed to buy beer.

decision involving gender classification, *Arp* v. *Workers' Comp. Appeals Bd., supra,* 19 Cal.3d 395, the court's entire analysis is based upon the invidious discrimination wrought by the gender classification without any discussion of the presence or absence of a fundamental right or interest.[7] Finally, as we noted earlier, in *Hardy* v. *Stumpf, supra,* 21 Cal.3d 1, 7, the court declared without qualification that gender classifications are deemed suspect in California.

In *Sail'er Inn,* Justice Peters, writing for a unanimous court, eloquently expressed the reasons why classifications based on sex should be subject to the same strict scrutiny applied in reviewing suspect classifications such as those based on race, lineage or national origin: "An analysis of classifications which the Supreme Court has previously designated as suspect reveals why sex is properly placed among them...[¶]Sex, like race and lineage, is an immutable trait, a status into which the class members are locked by the accident of birth. What differentiates sex from nonsuspect statuses, such as intelligence or physical disability, and aligns it with the recognized suspect classifications is that the characteristic frequently bears no relation to ability to perform or contribute to society. [Citations.] The result is that the whole class is relegated to an inferior legal status without regard to the capabilities or characteristics of its individual members. [Citations.] Where the relation between characteristic and evil to be prevented is so tenuous, courts must look closely at classifications based on that characteristic lest outdated social stereotypes result in invidious laws or practices.

"Another characteristic which underlies all suspect classifications is the stigma of inferiority and second class citizenship associated with them. [Citations.] Women, like Negroes, aliens, and the poor have historically labored under severe legal and social disabilities. Like black citizens, they were, for many years, denied the right to vote and, until recently, the right to serve on juries in many states. They are excluded from or discriminated against in employment and educational opportunities. Married women in particular have been treated as inferior persons in numerous laws relating to property and independent business ownership and the right to make contracts.

---

[7]Since *Arp* v. *Workers' Comp. Appeals Bd., supra,* 19 Cal.3d 395, involved a widower's right to claim maximum death benefits on the same basis as a widow, it is arguable that the issue of a property right or "vested interest" was present in the case. (See *Strumsky* v. *San Diego County Employees Retirement Assn.,* 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29].) Nevertheless, we think that the court's total reliance on the "suspect" gender classification in *Arp* is significant for the above analysis.

"Laws which disable women from full participation in the political, business and economic arenas are often characterized as 'protective' and beneficial. Those same laws applied to racial or ethnic minorities would readily be recognized as invidious and impermissible. The pedestal upon which women have been placed has all too often, upon closer inspection, been revealed as a cage." (5 Cal.3d at pp. 18-20.)

■ For reasons expressed by Justice Peters, gender-based classifications, like those based on lineage or race, must be strictly scrutinized irrespective of the nature of the interest implicated because the classifications in and of themselves are an affront to the dignity and self-respect of the members of the class set apart for disparate treatment. ■ ■ ■ ■ (See Karst, *The Supreme Court 1976 Term, Foreword: Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv.L.Rev. 1, 5-9, 26, 56-59.[8]) ■ Such classifications —sex, race and lineage—violate "the most fundamental interest of all, the interest in being treated by the organized society as a respected and participating member." (Karst, *The Supreme Court 1976 Term, Foreword: Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv.L.Rev. 1, 33.)

Defendants urge that we should apply an intermediate standard of review rather than the traditional two-tiered analysis. That a middle-tiered standard has not yet been adopted in California is amply borne out by the discussion of equal protection doctrine found in the majority opinion and separate concurring opinions of Justice Mosk and Chief Justice Bird in *Hawkins* v. *Superior Court, supra*, 22 Cal.3d 584. Furthermore, in light of the repeated affirmations by our Supreme Court that gender-based classifications are suspect and on that basis alone are subject to strict scrutiny, even if the Supreme Court should adopt an intermediate level of analysis, we are satisfied that sex-based

---

[8]Although we have concluded that sex-based classification demands strict judicial scrutiny irrespective of the interest affected, in the case at bench, a fundamental interest may also be affected.

The right to liberty is a fundamental interest under both the California and the United States Constitutions so that a classification scheme affecting the liberty interest must be subjected to the strict standard of review. (*People* v. *Saffell*, 25 Cal.3d 223, 228 [157 Cal.Rptr. 897, 599 P.2d 92]; *People* v. *Olivas*, 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375].) Prisoners do not lose their liberty interest upon incarceration. (Pen. Code, § 2600; see *In re Reynolds*, 25 Cal.3d 131, 133 [157 Cal.Rptr. 892, 599 P.2d 86]; *In re Brandt*, 25 Cal.3d 136, 137 [157 Cal.Rptr. 894, 599 P.2d 89].) The classification in question may be said to affect the residual liberty interest which women inmates retain despite their incarceration in that it denies them the opportunities afforded male inmates to serve their terms in minimum security facilities with the attendant privileges.

classifications will continue to be subjected to the highest level of review.[9]

■ We now apply the strict scrutiny test as it has been developed under the California Constitution to the case at bench. In defense of their policy of excluding women from minimum facilities, defendants argue that they have a compelling interest in protecting women in the jail system from sexual assaults and that the only effective way to do this is to keep men and women completely separated at all times.[10] They further argue that the small number of women who could take advantage of the opportunity for a minimum security program, the large number of inmates needed to perform labor essential to maintain the women's jail and the need to run the jails as economically as possible are sufficient justifications to render this gender-based classification constitutional.

■ In the course of developing "strict scrutiny" analysis, it has been established that "administrative convenience" is not an adequate state interest to meet that test—i.e., that it is bureaucratically efficient for an agency to provide its services or allocate its resources through classifications based on race, sex, or some other suspect factor does *not* render such a classification constitutional. (*Arp* v. *Workers' Comp. Appeals Bd., supra,* 19 Cal.3d 395, 409.) The Supreme Court has also held repeatedly that while avoidance of administrative costs is a valid state concern, it cannot justify a suspect classification in the face of the strict scrutiny test—that budgetary considerations may not be used to exclude certain groups from equal protection of the laws or restrict certain fundamental rights. (*Young* v. *Gnoss,* 7 Cal.3d 18, 28 [101 Cal.Rptr. 533, 496 P.2d 445]; *Castro* v. *State of California,* 2 Cal.3d 223, 241-242 [85 Cal.Rptr. 20, 466 P.2d 244].)[11]

---

[9]We note, as Chief Justice Bird points out in her concurring opinion in *Hawkins* v. *Superior Court, supra,* 22 Cal.3d at page 610, that Professor Tribe has suggested that the United States Supreme Court has probably underclassified gender-based discriminations. (Tribe, American Constitutional Law (1978) p. 1089.) We further note that Professor Karst predicts that under the Fourteenth Amendment "classifications based on sex will soon be at least fundamentally 'suspect.' (Karst, *The Supreme Court 1976 Term, Foreword: Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv.L.Rev. 1, 54.)

[10]Defendants also argue that Penal Code sections .4002, 4021, and 4029 mandate such complete separation. We deal with this contention in some detail below.

[11]However, in requiring a governmental unit to end an equal protection violation, the court may consider relative financial as well as social "costs" in weighing alternative approaches to a solution. (*Crawford* v. *Board of Education,* 17 Cal.3d 280, 309-310 [130 Cal.Rptr. 724, 551 P.2d 28].)

We agree that the county has a compelling interest in protecting female jail inmates from sexual assault while they are incarcerated; one of the primary goals of prison administration is physical protection of the inmates. However, we cannot agree that the necessary and only effective way to do this is to deny to women inmates privileges and programs available to male inmates. We fail to find a logical and substantial relationship between the *goal* expressed by defendants—protection—and its attainment by denying female inmates the opportunity to be incarcerated in a minimum security facility. It is *not* placement in minimum security which will arguably put women in physical danger; rather, it is placement in minimum security facilities without adequate separation or protection from male inmates and jailers. Defendants state that the reason for not building separate minimum security facilities for women is the expense such construction would involve. Their "protection" argument is thus nothing more than a defense based on the "administrative costs" of providing equal facilities and programs for women. As we explained above, budgetary considerations do not justify governmental violation of the right to equal protection of the laws.

Nor are we persuaded by defendants' additional arguments to support the constitutionality of the gender-based classification; namely, that the small number of women inmates, the number of inmates needed to maintain the women's jail, and the need to run an efficient jail justify the difference in treatment. Initially, we note that the fact that some 2,111 women were sentenced to jail in Orange County in 1977 indicates that the number of women who could potentially take advantage of a minimum security program is not insignificant or negligible. Next, we point out that to argue that a group of people is too small in number to be afforded a constitutional right is merely another argument that the right to equal protection should hinge on "administrative convenience." The argument that women cannot be sent to minimum security facilities because the county would be forced to hire civilian personnel to maintain the women's jail is also based on "administrative convenience" and as such cannot withstand strict scrutiny. Likewise, the contention that it is too expensive to provide minimum security for both men and women, so that women must wait for such privileges until additional funds are available, based as it is on a consideration of administrative costs must also fail.

Defendants contend that the decision in *Long* v. *State Personnel Bd.,* 41 Cal.App.3d 1000 [116 Cal.Rptr. 562], requires reversal of the trial

court's holding in the instant case. In *Long,* a female prison chaplain applied for a chaplain's job at a training center for young male offenders aged 18 to 23 years operated by the California Youth Authority. Upon being denied the position because of her sex, she challenged the State Personnel Board's decision on the ground of equal protection. The trial court's judgment denying a writ of mandate was affirmed by the Court of Appeal. Defendants point to that part of the *Long* decision rejecting the argument that the addition of security guards, alarm systems and some building reconstruction would make it safe for a female chaplain to function in a male youth facility, to support their argument that in the instant case budgetary and administrative concerns render their gender-based classification of male and female inmates constitutional.

The section of the *Long* opinion on which defendants rely is inapposite to this case. In rejecting the female chaplain's contention that guards, alarms, and other protections should be provided so that she could safely pursue her career as a chaplain in the youth authority setting, the court was dealing with the question of sex discrimination in employment. In doing so, the court adopted a standard of review akin to the "bona fide occupational qualification" of the 1964 Civil Rights Act and held that an employer is not required "to alter substantially his facility and procedure to suit the sex of the person involved." (*Id.,* at p. 1015.)[12] But, it is the court's analysis of the interests of the prisoners in the youth facility and of the state that is relevant to the present case. In this regard, the court concluded the inmates' interests in privacy, comfort and rehabilitation and the state's interest in their rehabilitation were irreconcilable with the chaplain's interest in employment at the facility—that these interests could not be met while a woman was functioning as the facility's chaplain. "Thus, the interests of the public and those of the inmates are substantially different from those of the petitioner and the members of her class. The former interests are so overwhelming as to constitute a compelling state interest in the male-only classification, thus satisfying equal protection standards. The classification is clearly necessary to further this interest." (*Id.,* at p. 1014.) Defendants, unlike those in *Long,* have demonstrated no compel-

---

[12]We are not convinced that the "bona fide occupational qualification," developed to meet the statutory needs of the Civil Rights Act of 1964 rather than the constitutional requirements of strict scrutiny (see *Long v. State Personnel Board, supra,* 41 Cal. App.3d 1000, 1015-1018) is an adequate test of the constitutionality of an employment classification based on sex. As we note in the text, however, such considerations are not apposite to the decision in the instant case.

ling state interest which can be accomplished *only* by the gender-based classification which they have imposed in allocating minimum security facilities.

Having explained our conclusion that women inmates of the Orange County jail system must be afforded equal protection of the laws in assignment to jail facilities, we emphasize again that the trial court has neither ordered defendants to provide women with separate minimum security facilities, nor ordered defendants to sexually integrate their minimum security facilities and attendant programs. Rather, the court has ordered that, in accordance with the principles of equal protection, defendants may not provide such facilities and programs for men only. The problem of whether to solve the equal protection violation by eliminating all minimum security jails, integrating them, or providing partially or completely separated facilities and programs, is left to the discretion of the county officials. The court's concern, and properly so, has been that in the guise of offering women "protection," they should not be confined in a "cage within a cage," while their male counterparts enjoy greater liberty only because of their sex. (See *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1, 20.)

2. *Equal Protection Under the Fourteenth Amendment*

Turning from the California Constitution to the Fourteenth Amendment of the United States Constitution, we note that the federal equal protection clause has not been applied to the issue of sex discrimination in the same manner as has our state clause. The federal application has been described as "rational basis" with a "bite." (Karst, *The Supreme Court 1976 Term, Foreword: Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv.L.Rev. 1, 54; Gunther, *The Supreme Court 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection* (1972) 86 Harv.L.Rev. 1, 20-24.) In *Frontiero* v. *Richardson,* 411 U.S. 677, 682 [36 L.Ed.2d 583, 589, 93 S.Ct. 1764], a plurality of the Supreme Court held that classifications based on sex were "suspect" and must be strictly scrutinized, but this view has never been embraced by a majority of the court. ▮▮ In *Reed* v. *Reed, supra,* 404 U.S. 71, however, the high court began the process of carving out a special middle-tier test, neither rational basis nor yet strict scrutiny, for gender-based classifications, stating that "[a] classification must be reasonable, not arbitrary, and must rest upon some ground of difference having *a fair and sub-*

*stantial relation to the object of the legislation."* (*Id.,* at p. 76 [30 L.Ed.2d at p. 229], (italics added.) And in *Craig* v. *Boren, supra,* 429 U.S. 190, 197 [50 L.Ed.2d 397, 407], the court set out a more definitive statement of the middle-tier test: "To withstand constitutional challenge . . . classifications by gender must serve important governmental objectives and must be stubstantially related to achievement of those objectives." (Accord, *Califano* v. *Goldfarb,* 430 U.S. 199, 210-211 [51 L.Ed.2d 270, 278-279, 97 S.Ct. 1021]; *Califano* v. *Webster,* 430 U.S. 313, 316-317 [51 L.Ed.2d 360, 363-364, 97 S.Ct. 1192]; see Karst, *The Supreme Court 1976 Term, Forward: Equal Citizenship Under the Fourteenth Amendment, supra,* 91 Harv.L.Rev. 1, 177-188.)

In the course of developing and applying the middle-tier test for sex discrimination, the United States Supreme Court has rejected "administrative convenience" as a valid basis for gender-based classifications. (*Califano* v. *Goldfarb, supra,* 430 U.S. 199, 211, fn. 9 [51 L.Ed.2d 270, 279]; *Craig* v. *Boren, supra,* 429 U.S. 190, 198 [50 L.Ed.2d 397, 407]; *Reed* v. *Reed, supra,* 404 U.S. 71, 76-77 [30 L.Ed.2d 225, 229-230]; see e.g., *Frontiero* v. *Richardson, supra,* 411 U.S. 677, 690 [36 L.Ed. 2d 583, 594]; *Stanley* v. *Illinois,* 405 U.S. 645, 656 [31 L.Ed.2d 551, 561-562, 92 S.Ct. 1208].) *Likewise, the court has intimated that the need for "administrative economy" does not justify gender-based discrimination.* (See *Califano* v. *Goldfarb, supra,* 430 U.S. 199, 211, fn. 9 [51 L.Ed.2d 270, 279]; *Craig* v. *Boren, supra,* 429 U.S. 190, 198 [50 L.Ed.2d 397, 407]; *Weinberger* v. *Wiesenfeld,* 420 U.S. 636 [43 L.Ed. 2d 514, 95 S.Ct. 1225]; see also Ginsburg, *Gender in the Supreme Court: The 1973 and 1974 Terms,* 1975 Sup. Ct. Rev. 1.) As we pointed out in our discussion of California law, defendants' claim that physical protection of female inmates is a compelling justification for the denial of equal treatment is in reality a justification based only on "administrative convenience" and "administrative economy" and, as such, will not withstand the scrutiny required by the state or federal Constitutions.

Although the United States Supreme Court has not yet dealt with the application of the Fourteenth Amendment to gender-based classifications of inmates in the prison setting,[13] there are several lower federal court decisions on the subject of sex discrimination in prisons: *Hill* v. *Estelle* (5th Cir. 1976) 537 F.2d 214; *Mitchell* v. *Untreiner* (N.D.Fla. 1976) 421 F.Supp. 886; *Tate* v. *Kassulke* (W.D.Ky. 1975) 409 F.Supp. 651; *McAuliffe* v. *Carlson* (D.Conn. 1974) 377 F.Supp. 896. *Hill* v. *Estelle, supra,* 537 F.2d 214, offers us no insight since it erroneously

---

[13]Defendants cite a recent Supreme Court case, *Bell* v. *Wolfish,* 441 U.S. 520 [60

applies the rational basis test to a gender-based discrimination and merely holds that the classification involved is neither arbitrary nor unreasonable. (*Id.,* at p. 216.) *Tate* v. *Kassulke, supra,* 409 F.Supp. 651, also provides little help, since the court there concluded that the difference in cleanliness between men's and women's jails was a product of the women's industry in cleaning their facilities and that injunctive relief was inappropriate to correct alleged inequities in space and custodial nature of the two jails because construction of new facilities for both men and women was imminent. (*Id.,* at p. 660.) The other cases, however, offer some guidance in applying the federal equal protection clause to the case at bench.

In *McAuliffe* v. *Carlson, supra,* 377 F.Supp. 896, males incarcerated in state prisons who became ill enough to be hospitalized during their imprisonment were charged hospital costs for their stays in state hospitals. Female prisoners who had to be hospitalized, however, were not charged for their hospitalization. The male prisoners brought suit charging a lack of equal protection of the laws. To justify its gender-based classification, the state argued that most female inmates had no means to pay hospital costs while most male inmates had the means; consequently, it was administratively convenient to apply the blanket sex-based rule it had developed. The court held that the gender-based classification was invalid under the Fourteenth Amendment both because it embodied an outdated notion of the economic status of women in our culture and because mere administrative convenience cannot justify a gender-based classification. (*Id.,* at pp. 902-903.)

*Mitchell* v. *Untreiner, supra,* 421 F.Supp. 886, is particularly relevant to the instant case. In *Mitchell,* a United States District Court was asked to examine conditions of incarceration at a county jail in rural Florida. The conditions revealed by the evidence were deplorable, amounting in many instances to cruel and unusual punishment. Cells were grossly overcrowded so that many inmates slept on the floor, often without mattresses; prisoners had received no exercise in many months; change of clothing and toilet articles were not provided; cells had not

---

L.Ed.2d 447, 99 S.Ct. 1861], for the proposition that lawful incarceration justifies limitations on the constitutional rights of prisoners, including the equal protection rights of female jail inmates. *Bell,* however, deals with the rights of pretrial detainees versus those of sentenced prisoners, rather than those of female versus male inmates which are entitled to a higher level of scrutiny. Moreover, *Bell* mandates *equal* treatment to promote prison security instead of condoning *unequal* treatment.

been cleaned regularly; vermin infested the jail; no inmates except trustees were provided with tables on which to eat their food or taken from their cells for meals. Besides ruling on the issue of cruel and unusual punishment, the court concluded that women inmates of the jail were denied equal protection of the laws because they were denied the opportunity to be trustees, to have contact visitation privileges, to have regular outdoor exercise, and to serve their sentences in a less severe facility than the county jail. (*Id.,* at p. 895.) The instant case also involves denial of the opportunity for housing in a minimum security facility, contact visitation, and greater access to outdoor exercise on the basis of an inmate's sex.[14]

We conclude that defendants' policies and practices in the treatment of female inmates of the county jail offend the equal protection clause of the Fourteenth Amendment.

## II
### THE APPLICABILITY OF PENAL CODE SECTIONS 4002, 4021, AND 4029 TO THIS CASE

Defendants contend that the problem presented by this suit—the provision of jail housing and programs to the sexes on an equal basis—is covered by Penal Code sections 4002, 4021, and 4029[15] and that compliance with the court's order would be in contravention of the statutes. They maintain that these sections dictate virtually complete separation of the sexes while in jail, arguing that this precludes housing both men and women at either of the existing minimum security facilities. They also point out that section 4029 mandating the extension to women of jail programs enjoyed by men does not require the implementation of that mandate until the Legislature provides the

---

[14] Defendants point to the fact that the detailed injunctive order issued by the district court in *Mitchell* contained no relief for the equal protection violations cited in the opinion and argue that this omission means that judicial relief for such violations is inappropriate and unnecessary. We do not know why the court's disposition contained no specific relief for the equal protection violations and speculation on this question would be fruitless. However, we do note that the court's order contained instructions for immediate planning of new jail facilities (*id.,* at p. 899), and that the court retained jurisdiction of the case for the purpose of issuing "other orders as are appropriate." (*Id.,* at p. 902.) In light of these facts, we cannot conclude that the court did not mean to provide a remedy for the equal protection violations which it identified, or that it determined that judicial relief was inappropriate for such violations.

[15] For the complete texts of Penal Code sections 4002, 4021, and 4029, see footnote 3, *ante.*

funds necessary to extend these programs. They argue that since the trial court did not hold section 4029 to be unconstitutional, it erred in directing defendants to provide equality of programming before receiving funds from the Legislature.

Initially, we note that legislative mandates cannot take precedence over constitutional provisions. (E.g., *United States* v. *County of Fresno,* 429 U.S. 452 [50 L.Ed.2d 683, 97 S.Ct. 699]; *People* v. *Navarro,* 7 Cal.3d 248, 260 [102 Cal.Rptr. 137, 497 P.2d 481]; *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1.) Thus, cessation of a violation of the constitutional right to equal protection of the laws in cases of gender discrimination may not wait upon the convenience of the Legislature. Moreover, insofar as separation of the sexes is concerned, the court made it crystal clear in its judgment that "nothing herein shall require the confinement of male and female inmates in the same facility or the joint participation of male and female prisoners in any program." Insofar as section 4029 is concerned, while subdivisions (a), (b), and (d) do require that better housing and other advantageous programs offered to inmates of one sex must also be provided to inmates of the other sex, subdivision (c) is the most important clause of the section for the purposes of the instant case. It states in salient part that "[n]othing in this section shall require the establishment of any facility for the use of, or the making available of any program, service or privilege to, any prisoner." Section 4029 thus does not require that advantageous programs such as minimum security facility detention, contact visitations, opportunities for outdoor work and recreation be offered to inmates of Orange County jails. Consequently, defendants have open to them an avenue for meeting both statutory and constitutional mandates either by discontinuing the privileges presently extended only to male inmates or by taking appropriate steps to extend like privileges to female inmates. Accordingly, the trial court did not err in failing to condition the implementation of its judgment on legislative funding.

### III
### THE APPROPRIATENESS OF
### THE TRIAL COURT'S REMEDY

Defendants contend that the judgment below is void for vagueness, ambiguity and unintelligibility because it fails to tell them whether and how they must extend the minimum security facilities and attendant programs now available to male inmates to female inmates and that this lack of specificity invalidates the judgment. They also ob-

ject to the word "similar" in the phrase "apply similar criteria to all inmates, regardless of sex" on the ground that the word "similar" is too vague to give them guidance in implementing the judgment. The contentions lack merit.

 Plaintiff has a clear right to the enjoyment of the equal protection of the laws and defendants have a clear duty to respect that right. Accordingly, mandamus is an appropriate remedy to enforce plaintiff's constitutional right to equal protection. (Code Civ. Proc., § 1085; cf. *National Assn. for Advancement of Colored People* v. *San Bernardino City Unified Sch. Dist.,* 17 Cal.3d 311 [130 Cal.Rptr. 744, 551 P. 2d 48]; *Silver* v. *Brown,* 63 Cal.2d 270 [46 Cal. Rptr. 531, 405 P.2d 571]; *Jackson* v. *Pasadena City School Dist.,* 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878]; *People* ex rel. *Lynch* v. *San Diego Unified School Dist.,* 19 Cal.App.3d 252 [96 Cal.Rptr. 658].) In framing the judicial remedy for equal protection violations such as those found in the case at bench, the court is vested with wide discretion. (Cf. *Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, 305-307.) Since defendants are not under a legal duty to provide minimum security facilities or outdoor work opportunities at all, the kind of facilities and programs to be provided consistent with the requirement of equal treatment of the sexes should be determined by the county and its officials. The court exercised commendable judicial caution by simply ordering defendants to refrain from providing facilities and programs to one sex which are not provided to the other and to provide like criteria in offering branch jail privileges to the two sexes, deferring to defendants' judgment the choice of the various options open to them to comply with that mandate. The judgment is not void for uncertainty, ambiguity or unintelligibility.

When the court issues its peremptory writ, it will be required to fix a reasonable time within which defendants must file their return showing how they have complied with the terms of the writ. If there is any uncertainty whether the steps taken by defendants as shown by their return constitute compliance with the judgment, such uncertainties may be resolved at a hearing on the return. Since the court retains continuing jurisdiction to make any orders necessary and proper for the complete enforcement of the writ (Code Civ. Proc., § 1097; *County of Inyo* v. *City of Los Angeles,* 71 Cal.App. 3d 185, 205 [139 Cal.Rptr. 396]), any inadequacy in the measures taken to correct the existing invidious discrimination may be dealt with in subsequent orders of the court.

## DISPOSITION

We conclude that the trial court was correct in holding that plaintiff's right to equal protection was violated under the provisions of both the California and United States Constitutions. The judgment below is affirmed.

Gardner, P. J., and McDaniel, J., concurred.