Filed 8/29/19 (unmodified opn. attached)

## CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KESCHEL COLLINS et al.,<br><br>    Plaintiffs and Appellants,<br><br>              v.<br><br>TONY THURMOND, as Superintendent, etc., et al.,<br><br>    Defendants and Respondents. | F075781<br><br>(Super. Ct. No. CV283224)<br><br>**ORDER MODIFYING OPINION**<br>**[NO CHANGE IN JUDGMENT]** |

It is hereby ordered that the opinion filed herein on August 27, 2019, be modified as follows:

1.      "TOM TORLAKSON, as Superintendent of Public Instruction, etc., et al., Defendants and Respondents" in the caption is changed to "TONY THURMOND, as Superintendent, etc., et al., Defendants and Respondents."

2.      The text in footnote 1 at the bottom of page 2 is deleted and the following inserted in its place:

These defendants are generally referred to in this opinion as either the local-level defendants or the state-level defendants.  The local-level defendants include KHSD, the Board of Trustees of KHSD, members of the KHSD Board of Trustees in their official capacities (Chad Vegas, Mike Williams, Bryan Batey, Jeff Flores, and Philip Peters) and the KHSD Superintendent (Bryon Schaefer), the Kern County Office of Education, and Christine Lizardi Frazier, in her capacity as the Kern County Superintendent of Schools.  The state-level defendants consist of Tom

Torlakson, in his former capacity as the State Superintendent of Public Instruction, and the California Department of Education (CDE). The current Superintendent is Tony Thurmond. For consistency with the underlying proceedings, we refer in this opinion to former Superintendent Torlakson. Appellants also sued the State of California.

There is no change in the judgment.


                                                          MEEHAN, J.
WE CONCUR:



DETJEN, Acting P.J.



SMITH, J.


2.

Filed 8/27/19 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KESCHEL COLLINS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TONY THURMOND, as Superintendent, etc., et al., <br><br> Defendants and Respondents. | F075781 <br><br> (Super. Ct. No. CV283224) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Sidney P. Chapin, Judge.

California Rural Legal Assistance, Inc., Cynthia L. Rice, Sahar Durali, Rebecca Buckley-Stein, Franchesca Verdin; Equal Justice Society, Eva Paterson, Allison Elgart; Mexican American Legal Defense & Educational Fund, Kip M. Hustace, Thomas A. Saenz; Greater Bakersfield Legal Assistance, Inc., Lyndsi Andreas, Celida Miramontes; Wilson Sonsini Goodrich & Rosati, Joni Ostler and Steven Guggenheim, for Plaintiffs and Appellants.

Christie Norris, as Amici Curiae on behalf of Plaintiffs and Appellants.

Amy Bisson Holloway, Edmundo R. Aguilar, Todd M. Smith, Bruce Yonehiro and Peter J. Stubbs for Defendants and Respondents.

-ooOoo-

## INTRODUCTION

The present case arises from information released to the public regarding suspensions, transfers, and other disciplinary proceedings in the Kern High School District of Kern County (KHSD). The data released allegedly demonstrates that racial bias has affected how KHSD disciplines minority students, and actions taken by KHSD allegedly demonstrate that KHSD actively attempted to hide this fact from the public.

Appellants in this case are a collection of parents, students, taxpayers, and community organizations. They sued a number of defendants, including both local- and state-level entities and individuals.[1] Appellants' claims against the local-level defendants were narrowed and allowed to proceed in the trial court, while all claims brought against the state-level defendants were dismissed with prejudice following various demurrers. In this appeal, appellants challenge the dismissal of several of the claims brought against the state-level defendants.

In the following opinion, we affirm the dismissal of most of appellants' claims against the state-level defendants, either because such claims do not state a cause of action or because such claims may be brought against the local-level defendants but not the state-level defendants. We ultimately find, however, that appellants have stated a cause of action under the equal protection clause of the California Constitution and they have properly petitioned for a writ of mandate based on the state-level defendants' ministerial duty to monitor the practices of local school districts for violations of federal

---

**1** These defendants are generally referred to in this opinion as either the local-level defendants or the state-level defendants. The local-level defendants include KHSD, the Board of Trustees of KHSD, members of the KHSD Board of Trustees in their official capacities (Chad Vegas, Mike Williams, Bryan Batey, Jeff Flores, and Philip Peters) and the KHSD Superintendent (Bryon Schaefer), the Kern County Office of Education, and Christine Lizardi Frazier, in her capacity as the Kern County Superintendent of Schools. The state-level defendants consist of Tom Torlakson, in his capacity as the State Superintendent of Public Instruction, and the California Department of Education (CDE). Appellants also sued the State of California.

law. We therefore conclude the trial court wrongly sustained the state-level defendants' demurrer on those claims, along with appellants' request for declaratory relief on the same issues. In a related conclusion, we determine that appellants' complaint contains sufficient allegations to demonstrate associational standing for one of the community organizations to pursue these claims against the state-level defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

The information that prompted this case was first made available in the 2009-2010 timeframe, although appellants allege that the subject conduct occurring in Kern County began before that time and has continued to the present day. The general crux of appellants' complaint is that KHSD has adopted and implemented a district-wide disciplinary program that is biased toward minority students, students who speak limited English, and others similarly situated; KHSD and the state-level defendants became aware of this bias in or around 2009 and 2010; and rather than correct those biases, KHSD and the state-level defendants either willfully ignored the information or actively sought to hide their conduct from further public scrutiny.

In the second amended complaint (the complaint),[2] appellants initially allege that "KHSD has developed and implemented written, verbal, formal and informal policies and practices regarding expulsion and referral for expulsion that are highly discretionary, and impose zero-tolerance standards that both violate express provisions of the California Education Code and result in the disproportionate suspension, expulsion and involuntary transfer of African-American and Latino students out of a general education setting and into alternative schools." Appellants further allege that certain students are marked in their files as problems and subjected to additional unwarranted scrutiny. Identifying

---

[2] We recount the general allegations as detailed in appellants' second amended complaint for the purposes of this overview. Where we discuss additional facts on a claim-by-claim basis below, we take our relevant facts from the allegations made in the version of the complaint relevant to that claim as identified in the headings.

certain racially charged statements allegedly made by teachers, appellants contend these actions create a racially hostile educational environment for minority students.

With respect to the underlying disciplinary procedures, appellants allege that KHSD has implemented a code that is highly subjective, both in what constitutes a violation (e.g., defiance toward employees, continual or habitual use of profanity, and hate violence) and how such violations should be punished (e.g.,"'Students who fail to comply with these rules and regulations will be counseled, reprimanded, suspended or expelled and/or arrested as the laws are applied.'"). It is this subjective system that appellants allege provides the cover for discriminatory practices at KHSD.

The complaint then details the underlying disciplinary statistics that appellants allege support their position. These include claims that in 2010, "KHSD gained statewide notoriety for its number of expulsions and suspensions reported to the U.S. Department of Education .…" This notoriety arose because, in 2009, KHSD reported 2,205 total expulsions, "the highest number of expulsions of any district in the state of California, including school districts with much larger enrollment." KHSD's rate of expulsion was 54.47 per 1,000 students, dwarfing both Kern County's rate of 14.87 per 1,000 students and the state average of 3.49 per 1,000 students. When broken down into broad racial categories, the rates in KHSD split further. "KHSD['s] average expulsion rate for White students was 18.70 per 1,000 students; the average for Latino students was 65.85 expulsions per 1,000 students …; and the average for African-American students was 110.21 expulsions per 1,000 students .…"

Following this disclosure and the publicity it brought, in 2010 KHSD reported a slightly lower total of 2,040 expulsions before reporting "no data on expulsions for the 2011-2012 school year, although required to do so by state law." "In 2013, the number of reported expulsions dropped to 256."

This reduction in expulsions, according to the complaint, occurred because KHSD implemented "a significant change in reporting practices and a change in [KHSD's]

4.

approach to discipline that resulted in students being transferred out of a general education setting and into an alternative school through the use of involuntary transfers, rather than through formal expulsion." Appellants also allege KHSD has "implemented a 'waiver' system, under which students and parents are convinced through intimidation, coerced or tricked into waiving the due process protections accompanying formal discipline and accepting immediate placement in alternative schools."

Appellants assert that, even with the reduction in expulsions, racial bias can be seen in the data. They note that in the 2012-2013 data, African-American students are still expelled at a rate of 24 per 1,000 students, compared to 7 per 1,000 students for Latinos, and 5 per 1,000 students for Whites. They also note that the types of behaviors resulting in expulsion are dramatically different depending on the race of the student. "While 58% of the White students … were expelled for the more serious offenses of possession of drugs or weapons or inflicting injury on another, 51% of the Latinos and just 33% of African-Americans were expelled for these reasons. Put another way, 67% of expelled African-American students were expelled for offenses that did not include physical injury or possession of drugs or weapons, while only 42% of expelled Whites were expelled for these less serious offenses."

Premised on the allegations that KHSD moved to suspensions and transfers over expulsions, appellants also allege that the racial disparities continued in the statistics regarding suspensions and alternative school placements. Thus, appellants allege that in 2013, KHSD's suspension rate was 16.3 percent of students, "or three times the state average." Further, the rates of suspension were again skewed. Rates of "38.61 per one hundred African-American students," "24.81 per one hundred Latino students," and "18.7 per one hundred White students" existed for suspensions that year. Moreover, "only 7.69 per one hundred White students were suspended for willful defiance" while "27.69 per one hundred African-American students and 13.08 per one hundred Latino students were suspended for willful defiance." In regard to what appellants assert are alternative school

5.

placements, they allege that minority students are disproportionately placed in those settings too. Thus, where KHSD "enrollment for [2013-2014] was 63% Latino, 6% African-American and 25% White," "enrollment in the alternative schools within [KHSD] was 79.65% Latino, and 7.29% African-American," with only 16.83 percent enrollment being White students.[3]

Having set forth the racial disparities underlying their claims, appellants detail allegations that alternative schools "are not intended to provide the full educational opportunity of a general education setting," thereby affecting the rights of minority students to obtain an education equal to their White counterparts. Appellants contend that "the relatively stable enrollment in alternative schools, with disproportionately greater percentages of Latinos and African-Americans, is due to the fact that KHSD is implementing the same policies and practices with respect to the involuntary transfer of students to these alternative schools as it did when assignments were the result of formal expulsion." They allege such practices "have not only been intentional, but also influenced by implicit and/or unconscious biases concerning African-American and Latinos … that exist in the United States, California, and Kern County today."

Appellants add further allegations that KHSD's policies are harmful to minority students, that specific plaintiffs in the litigation have been harmed by these policies, that employees in KHSD have "implemented policies and practices that incorporate negative stereotypes about African-Americans and Latinos," and that students placed in alternatives schools receive a reduced set of educational opportunities. Appellants then

---

[3] Appellants further allege that "nearly 50% of White enrollment in alternative schools operated by [KHSD] is concentrated in one school." They contend that nearly 80 percent of the schools in KHSD "are racially or ethnically over-represented to a statistically significant degree" and that suspension rates in predominately African-American schools are substantially higher than other schools in KHSD. Specifically, the "three schools with over 15% African-American enrollment had suspension rates of 20.5%, 25.6%, and 36.9% respectively, well over the district-wide rate of 16.3%."

6.

identify several specific instances of conduct by KHSD corresponding with their allegations of harm that were allegedly suffered by various plaintiffs.

Following these summaries of what allegedly happened to specific plaintiffs, the complaint alleges that KHSD's conduct is part of a pattern that both state and local agencies have an obligation to address. Appellants allege that instead of addressing these problems, "KHSD changed the method by which it reports suspensions and expulsions in an effort to conceal the disparate impacts of its policies and practices, and refused to report information to the State of California .…" The complaint details many of the ways KHSD's actions allegedly continued to affect minority students despite KHSD's knowledge of these impacts, and asserts that the state-level defendants "had actual notice of the disparities in education opportunity that resulted from the disproportionately high suspension, expulsion and assignment to alternative schools of Latinos and African-Americans in KHSD … but took no action to compel KHSD … to address or rectify these disparities and, specifically, failed to even enforce the mandate that KHSD submit data regarding discipline disaggregated by race, ethnicity and offense."

Based upon these allegations, the 90-page complaint raises several causes of action, many of which are discussed below.

Appellants' lawsuit was amended several times as a result of three demurrers. At each demurrer, some portion of the suit was dismissed with respect to the state-level defendants. Although various claims against the local-level defendants were permitted to proceed, all claims brought against the state-level defendants eventually were dismissed. Appellants apparently settled their claims against the local-level defendants, and this appeal followed.

## DISCUSSION

In this appeal, appellants contend the trial court wrongly dismissed various claims raised in multiple iterations of their lawsuit. These include, in the order in which we choose to consider them, equal protection claims under both the Federal and California

7.

Constitutions, a claim under the common schools clause of the California Constitution (art. IX, §§ 1, 5), a claim brought under Government Code section 11135 et seq., an Equal Educational Opportunities Act (EEOA) claim arising under 20 United States Code section 1703, a taxpayer claim brought under Code of Civil Procedure section 526a, and a claim seeking a writ of mandate under Code of Civil Procedure section 1085. Appellants contend their requests for declaratory judgment on each of these claims are proper and that one of the community organizations named as a plaintiff properly alleged organizational standing to proceed on the dismissed claims.

We begin by setting forth the standard of review for appeals following a demurrer and then analyze each of the claims raised by appellants. We analyze each disputed claim separately, summarizing the contentions, identifying relevant facts, and discussing legal principles as needed, with the exception that we consider the equal protection claims together to the extent possible.

### *Standard of Review*

"A demurrer tests the legal sufficiency of the factual allegations in a complaint." (*Regents of University of California v. Superior Court* (2013) 220 Cal.App.4th 549, 558.) "When a demurrer is sustained, appellate courts conduct a de novo review to determine whether the pleading alleges facts sufficient to state a cause of action under any possible legal theory." (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1242.) "When conducting this independent review, appellate courts 'treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law. [Citations.]'" (*Esparza v. Kaweah Delta Dist. Hospital* (2016) 3 Cal.App.5th 547, 552.) We may also consider matters subject to judicial notice and will affirm the judgment if any ground for the demurrer is well taken. (*Ramirez v. Tulare County Dist. Attorney's Office* (2017) 9 Cal.App.5th 911, 924.)

***Appellants' Second Amended[4] Complaint—Equal Protection Claims (Claims 1 & 4)[5]***

Appellants' complaint contained equal protection claims under both the United States Constitution and the California Constitution that were dismissed by the trial court. With respect to the state-level defendants, appellants' California claim was brought against both CDE and Superintendent Torlakson. The federal claim only named Superintendent Torlakson. As the analyses for each claim parallel each other, although not being coextensive, we consider them in combination, adding additional discussion where differences between the federal and state law analyses exist.

### *Appellants' federal allegations*

Appellants presented multiple allegations regarding how the various defendants violated the federal Constitution. However, these allegations were not made against Superintendent Torlakson in all instances. In the first allegation, appellants alleged the state-level defendants and Superintendent Torlakson "acting under color of state law, knowingly and intentionally perpetuated widespread and persistent policies and practices in the administration of the discipline, suspension, expulsion, truancy, and involuntary transfer and alternative school assignment of students, in a manner that impermissibly and invidiously targets African-American and Latino students on account of their race .…" In the second, appellants alleged that all of defendants' policies and practices in the administration of the discipline of students resulted in a hostile educational environment and caused a "harmful and invidious racially-disproportionate impact on African-American and Latino students .…"

---

**4** For the remainder of the Discussion, we identify in the headings the version of the complaint in which the subject claim appears, as explained in footnote 2, *ante*.

**5** We recognize and thank the 20 amici curiae who submitted a joint brief in support of appellants in this matter. We have reviewed the brief and respondents' responsive filing in this matter. As we do not rely on any of the materials specifically identified by amici in this opinion, we deny respondents' objections to considering extrajudicial material as moot.

9.

Appellants then alleged the local-level defendants covered up their discriminatory actions by changing their reporting policies and withholding data from the state in a way that "further demonstrates Defendant/Respondents' malicious intent to continue discrimination .…" Appellants alleged there were no "non-pretextual, race-neutral" explanations for KHSD's policies and that there was no rational basis for those policies. Appellants made three further allegations concerning "Defendants/Respondents'" actions and biases perpetuating "the gross race-based disparities in the provision of public education and the racially hostile educational environment that have been identified .…"

### *Appellants' California equal protection allegations*

Appellants took a different approach in alleging their state law equal protection claim. Appellants first noted that the "California Constitution guarantees all students in California basic education equality" and that this right is violated when "a public educational program 'falls fundamentally below prevailing statewide standards .…'" Appellants then alleged that the state-level defendants have a duty to provide basic educational equality. Finally, appellants contended the state-level defendants failed to provide the same educational opportunities to African-American and Latino students as provided to White students due to the alleged discriminatory practices generally alleged in the complaint.

### *General legal principles*

The Fourteenth Amendment to the federal Constitution provides that "'No State shall … deny to any person within its jurisdiction the equal protection of the laws.' The California Constitution likewise prohibits the denial of equal protection." (*Kimco Staffing Services, Inc. v. State of California* (2015) 236 Cal.App.4th 875, 884.) Due to the similar protections afforded, California relies on principles elucidated under the Fourteenth Amendment when considering its own Constitution's equal protection rights. Thus, California cases summarizing equal protection claims regularly recognize the similar federal standards. (*Kimco*, *supra*, at p. 884, fn. 7.) Of course, the California

10.

constitutional protections are independent from those provided in the Fourteenth Amendment and may involve slightly different analyses depending on the claims brought. (See *Molar v. Gates* (1979) 98 Cal.App.3d 1, 12 [observing both that the equal protection provisions of our state may demand a different analysis from one conducted only under the Fourteenth Amendment and that California's equal protection laws possess an independent validity from the Fourteenth Amendment].)

"As its name suggests, equal protection of the laws assures that people who are "'similarly situated for purposes of [a] law'" are generally treated similarly by the law." (*Vergara v. State of California* (2016) 246 Cal.App.4th 619, 644.) "'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.'" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) "If the two groups are not similarly situated or are not being treated differently, then there can be no equal protection violation." (*People v. Castel* (2017) 12 Cal.App.5th 1321, 1326.)

### *Identification of similarly situated groups*

The state-level defendants first contend appellants "fail to allege that they were treated differently from other similarly situated students." Specifically, the state-level defendants argue appellants are focusing on comparisons with White students generally, that each student's disciplinary story is unique, and that no allegations exist demonstrating a White student was in a similar situation to appellants and treated differently. Appellants respond that their allegations are not so superficial and that they satisfy applicable pleading standards.

The allegations made in the complaint are, in fact, more comprehensive than the state-level defendants contend. Appellants incorporate by reference their general factual pleadings and their descriptions of specific incidents of discipline. At the most general

11.

level, appellants allege that African-American and Latino students are being suspended and expelled at rates substantially higher than White students and that those rates increase even further when considering schools with higher enrollment of African-American students. Appellants go further, however, alleging that KHSD subjects all students to harsher punishments than necessary but that it incorporates into its disciplinary proceedings negative stereotypes about minorities, such as involvement in gang activity or low educational prospects, that resulted in increased punishment for African-American and Latino students.

Appellants then buttress these assertions with statistical support. Specifically, appellants allege "67% of expelled African-American students were expelled for offenses that did not include physical injury or possession of drugs or weapons, while only 42% of expelled Whites were expelled for these less serious offenses." In this way, appellants allege through reasonable inference that African-American and Latino students are regularly subjected to suspensions and expulsions for offenses that are less severe than their White counterparts and, thus, are treated differently than similarly situated White students who are not subject to suspension or expulsion for the same or similar conduct.

Upon a demurrer, we proceed as if admitting all material facts pleaded. (*Esparza v. Kaweah Delta Dist. Hospital*, *supra*, 3 Cal.App.5th at p. 552.) It is thus sufficient to allege with supporting facts that one group is sufficiently similar to another to allow a comparison as to whether they are being treated unequally under the law. (See *Cooley v. Superior Court*, *supra*, 29 Cal.4th at p. 253.) Appellants have sufficiently pleaded such an allegation here. Appellants have alleged, with statistical support, that minority students accused of similar behaviors as their White counterparts are subjected to expulsion and suspension for that conduct at different, and statistically significant levels. In this context, the nature of the evidence permits a comparison between similarly situated students—e.g., those accused of similarly serious offenses—based on identifiable groupings—e.g., race. That each individual decision may be dependent upon unique

12.

facts does not undercut the overarching, statistically based claim that, for example, the differing rates of expulsion and suspension for less serious conduct shows that minority students are treated differently than similarly situated White students for substantially similar conduct under the disciplinary codes.

We therefore continue to consider whether proper allegations of disparate treatment exist.

### *Allegations of disparate treatment under federal standards*

The requirements for proving that one group is being treated differently from another under the federal and state law are generally similar but diverge in some important ways. Accordingly, we begin with the analysis under federal law before proceeding to analyze state law as applied to appellants' allegations of disparate treatment.

Under federal law, "[t]o state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class. [Citation.] 'Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status.'" (*Serrano v. Francis* (9th Cir. 2003) 345 F.3d 1071, 1082, italics omitted.) This requires more than a disparate impact on protected groups. Thus, "'"even if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose."'" (*United States v. Coleman* (9th Cir. 1994) 24 F.3d 37, 39.) Moreover, failure to address known racial impacts does not satisfy the requirements for demonstrating discriminatory intent as "'awareness of consequences alone does not establish discriminatory intent.'" (*Ibid.*) While the federal standards do not require one to demonstrate discriminatory intent was the sole motivating factor, it must be one motivating factor underlying the contested actions, and can be shown through analysis of the events leading up to the challenged actions, statements made by relevant parties, or

13.

the departure from normal procedures, among other ways. (See *Avenue 6E Investments, LLC v. City of Yuma* (9th Cir. 2016) 818 F.3d 493, 504.)

In this case, the allegations made against the state-level defendants are insufficient to state a legal claim under the federal standards. As to the local-level defendants, appellants alleged a widespread pattern and practice of targeting minority students based on protected characteristics and actively covering up those actions by failing to report them as required. Other than naming Superintendent Torlakson in these claims, however, their complaint does not allege he participated in these actions and is thus wholly conclusory regarding his alleged direct liability.

As reflected in the briefing submitted, the principle allegation made against the state-level defendants is that they became aware of a discriminatory impact in the punishments imposed by the local-level defendants and failed to take adequate *curative* action. This failure included not following up on allegedly inadequate and incomplete reporting of punishments by the local-level defendants and failing to adequately fund supervision of the local-level defendants. There is no allegation of a discriminatory motive behind the state-level defendants' actions.

At best, the allegations show problems with inefficient bureaucratic action. Certain information, useful to identifying discriminatory intent harbored by local actors, was allegedly not collected at the state level based on a reporting system that was being poorly monitored. These failures led to the inability to cure what are alleged as racially disparate impacts occurring at the local level. These failures, however, are not alleged to have arisen from any identifiable racial animus on the part of the state. Accordingly, we conclude that appellants have failed to state a claim under the federal equal protection clause.

### *Allegations of disparate treatment under state standards*

Equal protection claims under the California Constitution differ from claims under the federal Constitution based upon how education is viewed under each Constitution.

Under the federal Constitution, "[p]ublic education is not a 'right' granted to individuals .…" (*Plyler v. Doe* (1982) 457 U.S. 202, 221.) While certainly recognized as a fundamental and necessary part of our social structure, under federal equal protection laws, "a State need not justify by compelling necessity every variation in the manner in which education is provided to its population." (*Id.* at p. 223.) In contrast, California has enshrined the right to education within its own Constitution. Accordingly, "established California case law holds that there is a fundamental right of equal access to public education, warranting strict scrutiny of legislative and executive action that is alleged to infringe on that right." (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1465.)

In part due to this fundamental right to education, the California Supreme Court long ago recognized that cases "authoritatively establish that in this state school boards do bear a constitutional obligation to take reasonable steps to alleviate segregation in the public schools, whether the segregation be de facto or de jure in origin." (*Crawford v. Board of Education* (1976) 17 Cal.3d 280, 290; see *id.* at p. 297 (*Crawford*).) Although focused principally on the effects of residential segregation on school assignments, *Crawford* was clear in explaining that this obligation exists "*regardless of the cause of such segregation.*" (*Id.* at p. 284.) Accordingly, "a school board in this state is not constitutionally free to adopt any facially neutral policy it chooses, oblivious to such policy's actual differential impact on the minority children in its schools. As recent California decisions concerning the constitutional obligations of state officials have held, public officials in some circumstances bear an affirmative obligation to design programs or frame policies so as to avoid discriminatory results." (*Id.* at pp. 296–297.)

Accordingly, under California's equal protection clause, a claim is stated when a policy adopted in California has a substantial disparate impact on the minority children of its schools, causing de facto segregation of the schools and an appreciable impact to a district's educational quality, and no action is taken to correct that policy when its

15.

impacts are identified. These are precisely the allegations made by appellants in this case and are sufficient to survive demurrer.

Respondents contend, however, that even with such allegations made, appellants cannot state a claim for relief. First, respondents allege that the state has no duty to act, and, consequently, the equal protection claims may only be directed to the local-level defendants, absent the presence of extreme interdistrict disparities such as those found in *Butt v. State of California* (1992) 4 Cal.4th 668 (*Butt*). In *Butt*, the court found that all students of one district would be subjected to unequal educational opportunities by the premature cessation of the school year. Respondents argue that appellants have failed to provide any allegations of district wide effects based on disciplinary practices and, therefore, have failed to demonstrate this case rises to the unprecedented, extreme, and emergency situation found to warrant state-level intervention as in *Butt*. We do not agree.

Respondents overstate the conditions that trigger state-level overview of local school districts under *Butt*. In *Butt*, students of the Richmond Unified School District faced the imminent closure of all schools based on a budgetary crisis. (*Butt*, *supra*, 4 Cal.4th at p. 673.) They filed suit, claiming the district's conduct would violate their fundamental rights to education, and obtained a preliminary injunction that was appealed to the California Supreme Court. (*Id.* at p. 674.) In generally affirming the preliminary injunction, the California Supreme Court outlined the state's obligations with respect to protecting Californians' fundamental right to education. In summary, the court explained that "[p]ublic education is an obligation which the State assumed by the adoption of the Constitution"; "'[m]anagement and control of the public schools [is] a matter of state[, not local,] care and supervision'"; and "the State's ultimate responsibility for public education cannot be delegated to any other entity [citations]." (*Id.* at pp. 680–681.) Thus, "[d]espite contrary federal authority, California constitutional principles require State assistance to correct basic 'interdistrict' disparities in the system of common

16.

schools, even when the discriminatory effect was not produced by the purposeful conduct of the State or its agents." (*Id.* at p. 681.)

The analysis continued as to when the state's obligations to act would be triggered. Relying principally on the two *Serrano* cases, *Serrano v. Priest* (1971) 5 Cal.3d 584 (*Serrano I*) and *Serrano v. Priest* (1976) 18 Cal.3d 728 (*Serrano II*), along with *Tinsley v. Palo Alto Unified School Dist.* (1979) 91 Cal.App.3d 871 (*Tinsley*), the court explained the state's role as follows. "It therefore appears well settled that the California Constitution makes public education uniquely a fundamental concern of the State and prohibits maintenance and operation of the common public school system in a way which denies basic educational equality to the students of particular districts. The State itself bears the ultimate authority and responsibility to ensure that its district-based system of common schools provides basic equality of educational opportunity." (*Butt*, *supra*, 4 Cal.4th at p. 685.) In this vein, "the equal protection clause precludes the State from maintaining its common school system in a manner that denies the students of one district an education basically equivalent to that provided elsewhere throughout the State." (*Ibid.*)

Recognizing that not all variances in educational quality are sufficient to trigger constitutional concerns, the Richmond Unified School District in *Butt* argued there was no real and appreciable harm to the educational equality provided to children of the district by closing early. (*Butt*, *supra*, 4 Cal.4th at p. 686.) The high court found, however, that the evidence presented in that case demonstrated closure "would cause an extreme and unprecedented disparity in educational service and progress." (*Id.* at p. 687.) Although the court did not specifically set forth the basic pleading requirements for a claim of "an extreme and unprecedented" harm (*ibid.*), the court repeatedly explained that the standard is whether "the actual quality of the district's program, viewed as a whole, falls fundamentally below prevailing statewide standards" (*id.* at pp. 686–687), thereby demonstrating "a real and appreciable impact on the affected students' fundamental

California right to basic educational equality" (*id.* at p. 688; see *id.* at p. 692). In *Butt*, the early closure of all schools would place educators in an extreme position, as they were unprepared for early closure, and would result in students being provided a lower quality education than that provided elsewhere in the state. Such a result triggered the state's duty to act.

In this case, appellants' pleadings track the requirements for relief set out in *Butt*. Appellants have alleged that students within KHSD are being subjected to racially discriminatory disciplinary proceedings and that the state became aware of the resulting discriminatory impact. Appellants have pleaded facts suggesting that minority students subjected to these policies are provided with a lower quality education than White students. They further allege that KHSD's disciplinary policies have created a segregated school system whereby minority students are placed in allegedly lower quality school settings in substantially higher proportions than their population or disciplinary requirements warrant.

Respondents are correct that appellants do not make allegations about interdistrict differences arising from KHSD's alleged segregating practices. But, as the California Supreme Court explained in *Crawford*, it has been widely accepted since *Brown v. Board of Education* (1954) 347 U.S. 483, 493 that racial segregation of any kind in school harms students by depriving them of an equal educational opportunity. (*Crawford*, *supra*, 17 Cal.3d at p. 295.) For purposes of stating a claim, it is reasonable to conclude that students of a district subject to de facto racial segregation due to racially discriminatory disciplinary practices are receiving an education that is fundamentally below the standards provided elsewhere throughout the state where the legal proscriptions on such discriminatory practices are being enforced.

Respondents next argue that, even if appellants have met the general pleading requirements set forth at the time of cases such as *Tinsley*, those pleadings are no longer sufficient given Proposition 1, which amended article 1, section 7, subdivision (a) of the

18.

California Constitution in 1979 to provide: "[N]othing contained herein or elsewhere in this Constitution imposes upon the State of California or any public entity, board, or official any obligations or responsibilities which exceed those imposed by the Equal Protection Clause of the 14th Amendment to the United States Constitution with respect to the use of pupil school assignment or pupil transportation." This argument is readily rejected. As the California Supreme Court explained in *Butt*, "Whatever effect this amendment may have on *Tinsley*'s result, it does not affect consistent interpretations of the California equal protection guaranty where, as here, assignment or transportation of students is not at issue." (*Butt*, *supra*, 4 Cal.4th at p. 685, fn. 13.)

The underlying claim in this case does not revolve around school assignments or transportation to correct school segregation, but rather focuses on the effects of allegedly discriminatory disciplinary practices that it seeks to both monitor and prevent. As such, any changes to California's equal protection laws brought on by Proposition 1 would not affect the pleading and proof requirements of the claims in this case. (See *Crawford v. Los Angeles Board of Education* (1982) 458 U.S. 527, 535 ["Moreover, even after Proposition I, the California Constitution still imposes a greater duty of desegregation than does the Federal Constitution. The state courts of California continue to have an obligation under state law to order segregated school districts to use voluntary desegregation techniques, whether or not there has been a finding of intentional segregation."]; *McKinny v. Board of Trustees* (1982) 31 Cal.3d 79, 92–93 ["However, the amendment neither releases school districts from their state constitutional obligation to take reasonably feasible steps to alleviate segregation regardless of its cause, nor divests California courts of authority to order desegregation measures other than pupil school assignment or pupil transportation. [Citation.] When a school district fails to fulfill its state constitutional obligations, we retain our power to compel, for example, school closure, school site selection, creation of special 'magnet schools,' curriculum changes, or other steps to overcome the adverse effects of school segregation."].)

Finally, respondents present some general arguments concerning the pleadings, including that appellants did not allege intentional discrimination or notice of that intentional discrimination, that appellants' statistics are insufficient to demonstrate a discriminatory intent, and that appellants' assertions of inaction in the face of knowing discrimination are false. To the extent these broader arguments relate to appellants' California equal protection claim, we reject them. With respect to the claims appellants have failed to allege intentional discrimination on the part of the state-level defendants, notice of that discrimination, or statistics that demonstrate intentional discrimination, our discussion of the differences between federal and state equal protection requirements demonstrates that, at least with respect to the state claims, evidence of a disparate impact is sufficient to support an equal protection claim based on unequal treatment affecting the fundamental right to an appropriate education. As there is no obligation to demonstrate intentional discrimination under California's equal protection clause when otherwise neutral polices adversely impact the fundamental right to education, respondents' claims that the allegations made do not reach the level of intentional discrimination are unconvincing.

For the reasons discussed, we conclude appellants stated an equal protection claim against the state-level defendants under California's equal protection guarantees predicated upon a disparate impact theory of liability.

***Appellants' Second Amended Complaint—Common Schools Clause Claim (Claim 2)***

Appellants' second claim of their complaint was brought pursuant to article IX, sections 1 and 5 of the California Constitution (the common schools clause). These provisions state that a "general diffusion of knowledge and intelligence" is essential to the preservation of rights and liberties of the people and require the Legislature to "encourage by all suitable means" the promotion of "intellectual, scientific, moral, and agricultural improvement," including by providing "for a system of common schools by which a free school shall be kept up and supported in each district at least six months in

20.

every year ….." Because the law is settled that these provisions do not require any particular quality or level of education, we conclude appellants have not stated a claim under the common schools clause based on the facts alleged.

### *Appellants' contentions*

Appellants allege the relevant constitutional provisions "impose on Defendants/Respondents the duty to provide Student Plaintiffs/Petitioners with an education that will teach them the skills they need to succeed as productive members of modern society." Appellants allege a breach of this duty through the expulsion and involuntary assignment of African-American and Latino students "to alternative education programs" because the quality of education offered by these schools "is substantially inferior to the quality of education provided by comprehensive high schools in KHSD." Appellants further contend that White students subject to discipline are "disproportionately sent" to a different school that "has more space and resources, including teachers, per student; a better-maintained physical plant; more diverse course offerings; and fewer and less visible security guards" than the other schools utilized for this purpose.

### *Applicable law*

Article IX, sections 1 and 5 of the California Constitution have been described as declarations of """"great principles and fundamental truths, to influence and direct the judgment and conscience of legislators in making laws, rather than to limit and control them, by directing what precise laws they shall make"""" that "do not mandate the Legislature to act in a particular manner regarding what precise laws shall be made to implement these principles and truths." (*Campaign for Quality Education v. State of California* (2016) 246 Cal.App.4th 896, 910.) As such, these provisions have not been considered to enshrine the right "to an education of some quality" or, indeed, any particular quality, and do not impose on the Legislature any affirmative duty to provide for a particular level of education expenditures. (*Id.* at p. 908; see *id.* at p. 915.) The

21.

provisions are part of a larger set of constitutional mandates supporting California's assumption "of a specific responsibility for a statewide public education system open on equal terms to all." (*Butt*, *supra*, 4 Cal.4th at p. 680.) This broader undertaking, however, is distinct from the provisions expressly provided in sections 1 and 5 of article IX of the California Constitution. (See *Butt*, *supra*, at p. 685 [noting that the equal protection clause may protect against denying students in one district an education basically equivalent to that provided elsewhere without restrictions based on the fact section 5 of art. IX of the Cal. Const. only provides for a guaranteed six-month minimum school term].)

### *Appellants cannot state a claim under the common schools clause*

Appellants' factual assertions, and their arguments on appeal, all focus upon the recognized importance of a student's right to an adequate education and the differences in education allegedly being provided to African-American and Latino students in Kern County. However, as they relate to a common-schools claim, these arguments miss the point. Appellants admit, through their contentions, that free schooling is being provided for African-American and Latino students subjected to the contested disciplinary actions. The argument raised is that this education is woefully inadequate in light of various factors, such as the location of the schools and educational and extracurricular activities being offered. However, the provisions relied upon do not guarantee a right to any particular quality or level of education. (*Campaign for Quality Education v. State of California*, *supra*, 246 Cal.App.4th at p. 908.) With no possibility that appellants can plead a violation of the one necessary requirement of the common schools clause, that a free school be kept up and supported at least six months a year,[6] their complaints about

---

[6] We reject appellants' suggestion that *Hartzell v. Connell* (1984) 35 Cal.3d 899, 909 permits a common-schools claim because extracurricular activities, such as those allegedly withheld in this case, are integral components of public education. *Hartzell* only concluded that such activities must remain free. Although the court left no doubt that such activities are integral components of an educational system based on their educational character, it made no

equality between the educational offerings of the various school settings involved do not raise a common schools cause of action. The trial court, thus, correctly dismissed this claim.

### *Appellants' Second Amended Complaint—Government Code Section 11135 Claim (Claim 3)*

Appellants argue the trial court wrongly dismissed their claim under Government Code sections 11135 and 11139 because the CDE and Superintendent Torlakson have statutory duties to determine whether there is probable cause that discrimination occurred in a state sponsored activity and, if such discrimination is found, take action to curtail state funding for that activity. Respondents raise several objections, alleging this claim was mooted by statutory amendments made in 2017, that no allegations of discrimination on the part of the state-level defendants were made, that the state-level defendants are not "recipient[s]" of funds subject to the law, that the law is not self-executing or subject to a private right of action, and that exhaustion of administrative remedies is required. We agree with respondents that the claims are moot.

#### *Appellants' contentions*

The complaint alleges a violation of Government Code section 11135 by all defendants, but provides different theories for the local- and state-level defendants. After providing an overview of Government Code section 11135 and its purported requirements, appellants allege that the local-level defendants are funded by the state and the local-level defendants subjected appellants to discrimination by failing to remedy known disparities in their discipline policies. Appellants then identify CDE and Superintendent Torlakson as defendants funded by the state who have funds appropriated for the purpose of monitoring and overseeing of local school districts' compliance with

---

pronouncement that the common schools clause mandated such activities in the first instance nor did it rely upon the clause in determining the educational character of the activities. (*Id.* at pp. 909–913.) Accordingly, we conclude appellants' argument again raises equal protection, not common schools, concerns.

23.

equal educational opportunity laws.  Appellants then allege these state-level defendants were "aware of the racial and ethnic disparities in suspension, expulsion, involuntary transfer and educational opportunity as alleged in this complaint, but took no action to ensure that KHSD and/or KERN [COUNTY OFFICE OF EDUCATION] were in compliance with the state and federal anti-discrimination provisions .…"

### *Applicable law*

The relevant code sections discussed with respect to this issue, beginning with Government Code section 11135, appear in article 9.5 of the statute, an article entitled "Discrimination."  These code sections are not only interrelated but are tied to other laws.  Accordingly, we set out several of them to illustrate the legal framework in which appellants seek relief.  Where appropriate, we also note the regulations adopted to enforce these laws.

Government Code section 11135, subdivision (a), currently reads, "No person in the State of California shall, on the basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.…"[7]

Government Code section 11136 states that, "Whenever a state agency that administers a program or activity that is funded directly by the state or receives any financial assistance from the state, has reasonable cause to believe that a contractor,

---

[7]    The current version of the relevant statutes became effective on January 1, 2017.  The law has thus changed since appellants filed their complaint in July 2015.  However, other than respondents' mootness argument, the parties do not argue that the changes affected appellants' ability to state a claim.  Accordingly, for clarity, we recount the law and consider appellants' claims as the law is currently written.

24.

grantee, or local agency has violated the provisions of Section 11135, Part 2.8 (commencing with Section 12900) of this code, Section 51, 51.5, 51.7, 54, 54.1, or 54.2 of the Civil Code, or any regulation adopted to implement these sections or Article 1 (commencing with Section 12960) of Chapter 7 of this code, the head of the state agency, or his or her designee, shall notify the contractor, grantee, or local agency of such violation and shall submit a complaint detailing the alleged violations to the Department of Fair Employment and Housing for investigation and determination pursuant to Article 1 (commencing with Section 12960) of Chapter 7 of this code."

The powers and duties statutorily granted to the Department of Fair Employment and Housing (DFEH) are contained in Government Code section 12930. These powers specifically reference Government Code section 11135, stating DFEH has the power and duty, "To receive, investigate, conciliate, mediate, and prosecute complaints alleging practices made unlawful pursuant to Article 9.5 (commencing with Section 11135) of Chapter 1 of Part 1, *except for complaints relating to educational equity brought under Chapter 2 (commencing with Section 200) of Part 1 of Division 1 of Title 1 of the Education Code and investigated pursuant to the procedures set forth in Subchapter 5.1 of Title 5 of the California Code of Regulations, and not otherwise within the jurisdiction of the department*." (Gov. Code, § 12930, subd. (f)(4), italics added.)

For its part, Education Code section 200 provides that, "It is the policy of the State of California to afford all persons in public schools, regardless of their disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, equal rights, and opportunities in the educational institutions of the state...." Education Code section 201, subdivision (g), notes that the law "shall be interpreted as consistent with Article 9.5 (commencing with Section 11135) of Chapter 1 of Part 1 of Division 3 of Title 2 of the Government Code," among others.

25.

Returning to the Government Code, section 11137 provides that, "If it is determined that a contractor, grantee, or local agency has violated the provisions of this article, pursuant to the process described in Section 11136, the state agency that administers the program or activity involved shall take action to curtail state funding in whole or in part to such contractor, grantee, or local agency."

Finally, Government Code section 11139 clarifies that, "The prohibitions and sanctions imposed by this article are in addition to any other prohibitions and sanctions imposed by law." It goes on to expressly confirm that "This article and regulations adopted pursuant to this article may be enforced by a civil action for equitable relief, which shall be independent of any other rights and remedies." (*Ibid.*)

### *Appellants' claim is now moot*

Respondents contend appellants' claim is moot given the recently enacted statutory framework noted above. Specifically, respondents argue that the amendments modifying Government Code section 11136 included the changes to Government Code section 12930 that excluded "'educational equity'" claims that could be brought under Government Code section 11135 from DFEH's authority. Respondents allege that this removed educational claims such as those raised by appellants from the ambit of Government Code section 11135 and, consequently, Government Code section 11139 does not provide a right to sue separately on the grounds alleged. In this instance, we agree.

The statutory framework shows that Government Code section 11135 et seq. provides an alternative and coexistent right to sue over discriminatory practices implemented by recipients of state funding. As an alternative right, however, its existence is not essential to ensure that aggrieved individuals have access to the court system and, as such, is readily subject to modification by the Legislature. Here, the legislative history shows the Legislature intentionally chose to modify enforcement of Government Code section 11135 by placing the full scope of the complaint process

26.

allowed under Government Code section 11136 within DFEH's authority. At the same time, it purposefully excluded "educational equity claim[s]"—such as those brought under Education Code section 200, another statute generally covering discriminatory behavior, although limited to the educational field and not otherwise falling within the grant of authority—from DFEH's investigative authority. In this way, it is apparent that the Legislature intended to remove such claims from the scope of Government Code section 11135. The Legislature was well within its authority, particularly so here, where multiple constitutional and statutory provisions already exist to remedy educational equity claims.

Were we to find appellants could state a claim under the modified statutory scheme as alleged in this instance, we would create a catch-22. Upon showing the state-level defendants were aware of students being subjected to discriminatory behaviors under Government Code section 11135, appellants' relief would come in the form of enforcement of the provisions of Government Code sections 11136 and 11137. However, these provisions would only require the state-level defendants to "submit a complaint detailing the alleged violations to [DFEH] for investigation and determination." Yet, when that complaint arrived, DFEH would be without statutory authority to investigate and make a determination on the complaint under Government Code section 12930. Knowing appellants retain rights under the equal protection clause and Education Code section 200, we find the Legislature could rationally choose to exclude appellants' claims from the purview of Government Code section 11135 and, accordingly, conclude appellants' claims are mooted by the current statutory scheme. Thus, the trial court correctly dismissed this claim.

### *Appellants' Initial Complaint—EEOA Claim (Claim 7)*

Appellants' initial complaint contained a claim brought under the EEOA (20 U.S.C. § 1703). The trial court dismissed this claim, stating "In addition to failing to state facts sufficient to constitute a cause of action, it appears the presumption of

27.

concurrent state jurisdiction [citation] is overcome by implication [citation], and a claim under the EEOA must be filed exclusively in federal court." Appellants contend the trial court was incorrect on both bases. We agree with the trial court that claims under the EEOA are exclusively federal actions.

### *Applicable law*

In *Driscoll v. Superior Court* (2014) 223 Cal.App.4th 630 (*Driscoll*), this court provided a detailed discussion of the process undertaken to determine when state courts have concurrent jurisdiction over federal claims in the context of the federal False Claims Act (31 U.S.C. § 3729 et seq.) actions. In summary, courts begin with a presumption of concurrent jurisdiction over federal law claims. (*Driscoll*, *supra*, at p. 637.) This presumption may be overcome in one of three ways: "'[(1)] by an explicit statutory directive, [(2)] by unmistakable implication from legislative history, or [(3)] by a clear incompatibility between state-court jurisdiction and federal interests.'" (*Ibid.*) Notably, "'the mere grant of jurisdiction to a federal court does not operate to oust a state court from concurrent jurisdiction ….'" (*Id.* at p. 638.) When it comes to considering the incompatibility of concurrent jurisdiction, "'[F]actors indicating clear incompatibility "include the desirability of uniform interpretation, the expertise of federal judges in federal law, and the assumed greater hospitality of federal courts to peculiarly federal claims."'" (*Id.* at p. 640.)

### *There are at least two provisions incompatible with concurrent jurisdiction*

Respondents focus only on an alleged incompatibility with concurrent jurisdiction and rely exclusively on one federal court's statement that concurrent jurisdiction is precluded by the language of the EEOA.[8] (See *Stanley v. Darlington County School*

---

[8] Neither party cites to any on-point California determination. In our own research, we have been unable to identify any California cases substantively analyzing an EEOA claim or considering this jurisdictional issue. We have also been unable to identify, and have not been pointed to, any other state that has expressly considered this issue, although it appears from unpublished opinions that Illinois state courts may recognize the availability of EEOA claims in

28.

*Dist.* (U.S. Dist. Ct., S.C. 1995) 879 F.Supp. 1341, 1367, reversed in part (4th Cir. 1996) 84 F.3d 707 (*Stanley*).)  Although dicta, as the court expressly noted it need not resolve the issue, the *Stanley* court looked to various provisions of the EEOA and concluded "the EEOA *does not* create any administrative remedy and does not provide for suit in state court."  (*Stanley*, *supra*, 879 F.Supp. at p. 1367 & fn. 17.)  We agree with this conclusion.

Following the analysis required under *Driscoll*, we first consider generally whether state court jurisdiction is incompatible with federal interests before looking more specifically at whether there are any instances of clear incompatibility.  At a general level, we see no conflict between state court adjudication of the federal equal opportunities law and the federal interest in having its laws enforced.  As respondents explain in their substantive argument, the EEOA is generally interpreted as preventing behavior "coextensive with that prohibited by the fourteenth amendment .…" (*Castaneda v. Pickard* (5th Cir. 1981) 648 F.2d 989, 1000–1001.)  California courts regularly consider and resolve equal protection claims brought under the Fourteenth Amendment, including in this case, and are well versed in the federal nuances of the law, both because we consider these federal claims directly and because we generally interpret our state equal protection guarantees in light of the federal requirements.  We thus have no doubt that California courts could adequately and fairly adjudicate federal claims under the EEOA, supporting the presumption of concurrent jurisdiction.

The question then becomes whether specific aspects of the EEOA are clearly incompatible with concurrent state court jurisdiction.  The *Stanley* court relied on two aspects of the EEOA to support its position, general statements referencing "'courts of the United States'" and the express provision in 20 United States Code section 1753 that

---

certain contexts.  (See *Board of Education of Joliet Township High School District No. 204 v. Will County Regional Board of School Trustees* (Mar. 8, 2019, No. 3-17-0376) 2019 Ill.App. Unpub. Lexis 385, *P20.)  We thus conclude there is no broad recognition or practice of concurrent jurisdiction with respect to EEOA claims.

29.

the "rules of evidence required to prove that State or local authorities are practicing racial discrimination … shall be uniform throughout the United States." (Accord, *Stanley*, *supra*, 879 F.Supp. at p. 1367, fn. 17.)  We are not persuaded, as the *Stanley* court was, that the general references suggesting actions only by courts of the United States show incompatibility with state court jurisdiction.[9]

However, we have identified two provisions of the law that we conclude are incompatible with concurrent jurisdiction, 20 United States Code sections 1752 and 1753. Section 1752, which has now expired,[10] provided that "any order on the part of any United States district court which requires" transferring students to overcome discriminatory imbalances shall not become effective "until all appeals in connection with such order have been exhausted" or timed out.  Although no longer applicable, this language is inconsistent with an intent for concurrent jurisdiction, as it only delayed enforcement of remedial orders by United States district courts and not all courts of initial or competent jurisdiction.

Next, as noted in *Stanley*, 20 United States Code section 1753 provides that the "'rules of evidence required to prove that State or local authorities are practicing racial

---

[9]    An example of such a general reference is found at 20 United States Code section 1712: "a court, department, or agency of the United States shall seek or impose only such remedies as are essential to correct particular denials of equal educational opportunity or equal protection of the laws."  We read this statement similarly to how we must read the general jurisdictional provision of 20 United States Code section 1708:  "[t]he appropriate district court of the United States shall have and exercise jurisdiction .…"  Neither statement limits jurisdiction only to federal courts.  (*Driscoll*, *supra*, 223 Cal.App.4th at p. 638.)  We also note that several provisions of the law only refer to courts of competent jurisdiction or otherwise suggest the possibility of concurrent jurisdiction.  (See 20 U.S.C. §§ 1707 ["[w]hen a court of competent jurisdiction determines"], 1718 ["[t]he court of initial jurisdiction"].)

[10]   Title 20 United States Code section 1752 expired on its own terms "at midnight on June 30, 1978."  The section was considered a temporary extension of a prior law designed to postpone the effectiveness of certain desegregation orders where district courts had misused their remedial powers.  (See *Morgan v. Kerrigan* (1st Cir. 1975) 523 F.2d 917, 920.)  Although expired, we view the statute as an indication of what types of action Congress considered covered under the law.

discrimination in assigning students to public schools shall be uniform throughout the United States.'" (*Stanley*, *supra*, 879 F.Supp. at p. 1367, fn. 17.) We agree with the *Stanley* court that such a provision cannot be fully effectuated should state courts have concurrent jurisdiction because Congress cannot force a uniform and complete set of evidentiary rules upon the states. (*Ibid.*) This desire for uniform application of evidentiary rules is clearly incompatible with the presumption of concurrent jurisdiction and, taken with the expired provision discussed above, demonstrates clear incompatibility with concurrent jurisdiction. Thus, the trial court correctly dismissed this claim.

### *Appellants' Third Amended Complaint—Taxpayer Claim (Claim 7)*[11]

Appellants' third amended complaint contained a taxpayer claim brought pursuant to Code of Civil Procedure section 526a. The trial court dismissed this claim for a "lack of factual allegations upon which to base standing; failure to state cause of action, [Code of Civil Procedure] section 430.10[, subdivision ](e); and failure to exhaust administrative remedies." (Full capitalization omitted.) On appeal, appellants contend it is proper to name the state-level defendants in a taxpayer suit, that they alleged governmental waste under two distinct and appropriate theories, and that there was no need to exhaust administrative remedies to bring its claim. While we agree a cause of action exists, we conclude appellants were required to exhaust administrative remedies to proceed in this instance.

#### *Appellants' contentions*

Appellants' third amended complaint provides factual support for two general theories of liability under the taxpayer cause of action. For the first general theory, appellants contend CDE and Superintendent Torlakson "are responsible for maintaining and reporting current and accurate educational data, …, along several indicators required

---

[11] Appellants' taxpayer claim, originally the eighth claim, was renumbered as the seventh claim in the third amended complaint.

by state and federal law." Appellants allege, however, that aside from "administration of data-gathering tools" and "the online data-reporting tool of 'DataQuest,'" CDE and Superintendent Torlakson "have failed to establish, operate, or maintain appropriate systems of monitoring or accountability for this required data gathering and reporting by districts and counties .…" Appellants point specifically to alleged failures "to require corrective action" when local districts failed to certify or verify mandated data and failures to "perform any subsequent audit or implement other accountability mechanisms in order to ensure correction of erroneous data sets or reporting practices." Appellants also appear to allege a similar complaint with respect to a failure to "comply[] with state and federal mandates regarding specialized education programs for students," in particular with respect to ensuring "equal educational access for English language learner ('ELL') students .…"

In the second general theory, appellants allege CDE and Superintendent Torlakson "have approved budgets and authorized payments" to local school districts despite knowledge those districts "engaged in practices that discriminated against or impacted Latinos and African American students." Appellants contend that money is provided "to pay for the personnel and services necessary to supervise, monitor and oversee the performance of local school districts and county offices of education with respect to their obligations under state and federal constitutions," that CDE and Superintendent Torlakson have an "obligation to curtail funding when an agency has engaged in prohibited discrimination," and that CDE and Superintendent Torlakson failed "to execute its monitoring power to prevent and provide redress" for violations of laws in these regards.

### *Applicable law*

"[Code of Civil Procedure] [s]ection 526a creates a taxpayer private right of action to restrain the illegal or wasteful expenditure of public funds. It provides in pertinent part: 'An action to obtain a judgment, restraining and preventing any illegal expenditure

32.

of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein.' Although the statutory language authorizes a taxpayer action only as to local governmental units and their officers, courts have extended section 526a's reach to state agencies." (*Animal Legal Defense Fund v. California Exposition & State Fairs* (2015) 239 Cal.App.4th 1286, 1291.)

A "'taxpayer action must involve an actual or threatened expenditure of public funds. [Citation.] [¶] General allegations, innuendo, and legal conclusions are not sufficient [citation]; rather, the plaintiff must cite specific facts and reasons for a belief that some illegal expenditure or injury to the public fisc is occurring or will occur.'" (*County of Santa Clara v. Superior Court* (2009) 171 Cal.App.4th 119, 130.) Similarly, the "term 'waste' as used in [Code of Civil Procedure] section 526a means something more than an alleged mistake by public officials in matters involving the exercise of judgment or discretion." (*Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288, 310.) Rather, it is more readily understood as "a 'useless expenditure of funds.'" (*Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1138.) Accordingly, "the statute should not be applied to principally 'political' issues or issues involving the exercise of the discretion of either the legislative or executive branches of government." (*Humane Society of the United States v. State Bd. of Equalization* (2007) 152 Cal.App.4th 349, 356.) Likewise, no claim will "lie where the challenged governmental conduct is legal." (*Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 714.)

### *Discussion*

The underlying theory for appellants' taxpayer claim is one of waste through inaction. Appellants contend the state-level defendants have a duty to act to monitor and correct potentially discriminatory activities and to curtail funding for school districts

where such discrimination is found. Respondents contend that no claim can be brought under the facts alleged here because there is no mandatory duty to act on the part of the state-level defendants—meaning all of their contested actions are discretionary political issues—and their budgetary decisions are both ministerial and legal.

We begin with the allegations that the state-level defendants are engaging in waste by approving the local-level defendants' budgets. To state a claim, appellants must allege some illegal action by the state-level defendants. As to approving educational budgets, the state-level defendants assert that their duties and obligations are pursuant to Education Code section 14000 and are limited to verifying that the budget requests submitted by the local-level defendants meet statutory requirements. Appellants do not contest this position, but argue that respondents were aware of evidence of discriminatory actions and approved the budgets regardless, failing in an alleged duty to correct those actions.

Although appellants' contentions are vague as to the nature of the state-level defendants' actions, appellants do minimally allege that the state-level defendants are authorizing funds that they know are being illegally used by their recipients, that illegality arising, at a minimum, from a violation of the equal protection clause. Respondents' objections to these pleadings are based on the proposition that the only actions taken by the state-level defendants are mandated by the Education Code and do not involve any budgetary decisions other than verifying state mandated formulas are followed. Therefore, the state-level defendants are not knowingly wasting funds but, instead, are only confirming preexisting funding standards are met—leaving any claim about waste to fall on those local-level actors who then determine how to spend those funds.

We must treat the state-level defendants' demurrer(s) as admitting properly pleaded material facts, including appellants' allegation that the state-level defendants approved budgets with knowledge that local-level defendants would use approved funds

34.

to engage in discriminatory and illegal practices. The proposition that the state-level defendants only verify that state-level formulas are being followed begs the relevant question. While defendants may dispute the nature of, and procedures followed in, the budget approval process, disputes of fact do not defeat the statement of a claim. Nor does the state-level defendants' argument that their budget review is limited in scope overcome appellants' allegations that defendants had knowledge of illegal activity being supported by their budgets. This undercuts defendants' implied theory that they could not have known about any illegal expenditures as a result of the budget approval process. At the pleading phase, the question is only whether the allegations constitute a cognizable cause of action, not whether the allegations will be proved or defeated by a defense to the claim.[12]

### *Appellants have failed to exhaust administrative remedies*

A taxpayer suit is designed to facilitate the resolution of legal issues that may not otherwise be justiciable due to standing issues. Thus, "where the Legislature has provided an administrative remedy, a taxpayer action cannot be used in lieu of that remedy." (*Animal Legal Defense Fund v. California Exposition & State Fairs*, *supra*, 239 Cal.App.4th at p. 1301.) The question raised in this case is whether the Uniform Complaint Procedure administrative remedy available to those suffering from discriminatory practices at the local level is a process that must be completed to bring a

---

[12] While appellants have stated a viable taxpayer claim, we note that it is limited to the theory discussed above. To the extent appellants claim the state-level defendants are wasting state funds by failing to fully implement a monitoring system for discriminatory practices, their claims are undercut by their own contentions. Appellants' pleadings confirm that the state level defendants have utilized funds to monitor potential discriminatory actions, but they take issue with how that system has been designed. The extent to which those funds are appropriately spent is, absent additional allegations that the assignment of funds to that program is illegal, a political issue involving Legislative discretion on how to comply with their legal obligations. Such claims are not allegations of waste. (See *Humane Society of the United States v. State Bd. of Equalization*, *supra*, 152 Cal.App.4th at p. 356.)

taxpayer lawsuit based on allegations the state is wasting money by funding such practices. We conclude that it is.

The Uniform Complaint Procedures (UCP) set forth administrative procedures for resolving grievances "regarding an alleged violation by a local agency of federal or state law or regulations governing educational programs, including allegations of unlawful discrimination …." (Cal. Code Regs., tit. 5, § 4610, subd. (a).) The regulations apply to "the filing of complaints which allege unlawful discrimination … against any protected group as identified under Education Code section 200 and 220 … in any program or activity conducted by a local agency, which is funded directly by, or that receives or benefits from any state financial assistance." (*Id.*, subd. (c).) The referenced complaints are typically filed with the local agency, which then has 60 days to conduct and complete an investigation. (See *id.*, § 4631, subds. (a), (e).) The resulting conclusion can be appealed to CDE, which must again complete its review in 60 days. (*Id.*, §§ 4632, 4633.) The regulations do not appear to restrict who may file complaints and appellants have pointed to no reason why the taxpayer plaintiff could not have filed an administrative complaint in the first instance.

These proceedings are specifically designed to administratively resolve allegations of discrimination under Education Code section 200, as well as similar complaints. (See Ed. Code, § 221.1.) They would thus appear to bar any taxpayer action alleging discrimination in the first instance. Appellants argue, however, that the administrative remedies are inapplicable both by their terms and under the law. First, appellants point to California Code of Regulations, title 5, section 4631, subdivision (f), which provides that "Nothing in this chapter shall prohibit the parties from utilizing alternative methods to resolve the allegations in the complaint, including, but not limited to, mediation." Appellants contend this means the process can be avoided completely by immediately filing an action in court. But the plain language of the provision suggests just the opposite, the filing of an administrative complaint is a requirement to resolving

allegations of discrimination and the provision only provides that once a complaint is filed, the parties can submit it to an alternate method for resolution.

Next, appellants contend the proffered administrative remedy is inadequate because it cannot force the state-level defendants "to expend funds or stop expending funds in support of a process that fails to meet their constitutional obligations and promotes discrimination." We disagree. The administrative complaint procedures provide an opportunity to correct discriminatory practices undertaken by the local agency. While appellants would prefer the state-level defendants simply cease funding activities that are discriminatory or provide funds for certain remedial practices, the gravamen of its complaint is the allegedly continuing discrimination taking place at the schools themselves. Identifying and correcting such practices through the administrative process reaches the same goal and, thus, provides an adequate remedy. (See *AIDS Healthcare Foundation v. State Dept. of Healthcare Services* (2015) 241 Cal.App.4th 1327, 1351 ["an administrative remedy is not inadequate simply because it is not the result desired"].)

Finally, appellants suggest that the case law requiring exhaustion of administrative remedies for taxpayer actions is inapplicable here because the cases cited involved underlying criminal matters. We see no merit in this assertion. Nothing in the case law suggests that the exhaustion requirement is limited to instances where the underlying conduct is criminal. Although our Supreme Court in *Nathan H. Schur, Inc. v. City of Santa Monica* (1956) 47 Cal.2d 11 (*Schur*) was dealing with contentions that the granting of certain gaming licenses violated criminal laws, their discussion of the scope of taxpayer actions to enjoin such conduct had a broader message. As the court explained, "There appears to be no reason, however, why a municipal corporation with valid authority to do so, holding a public hearing and making a quasi-judicial determination with reference to the issuance of a license to engage in a certain business, should be required to justify its action in a trial *de novo* in the court whether the one attacking its

37.

determination is a taxpayer or one of the applicants for a license. The local officials are vested with the power of determination and such determination is reviewable by mandamus or certiorari .…" (*Schur*, *supra*, 47 Cal.2d at pp. 17–18.)

While the issue in *Schur* was the granting of gaming licenses, we see no difference between the authority to issue such licenses in that case and the authority to correct complaints of discrimination in this case. In both instances, the government has the statutory right to investigate and reach a conclusion that is subject to review by mandamus if necessary. There is no principled reason to permit taxpayer actions to bypass acceptable administrative remedies that are otherwise required to be pursued merely because the underlying conduct allegedly violates civil rights rather than criminal laws. The trial court thus properly dismissed this claim.

### *Appellants' Third Amended Complaint—Writ of Mandate Claim (Claim 8)*

Appellants' third amended complaint also contained an action seeking a writ of mandate brought pursuant to Code of Civil Procedure section 1085. The trial court dismissed this claim on the same grounds as the taxpayer action; for a "lack of factual allegations upon which to base standing; failure to state cause of action, [Code of Civil Procedure] section 430.10[, subdivision ](e); and failure to exhaust administrative remedies." (Full capitalization omitted.) On appeal, appellants contend they identified multiple ministerial duties that would support a writ of mandate, including the duty to provide equal access to the public school system, to initiate proceedings under Government Code section 11136, and to monitor legal compliance by local education agencies under federal law. Appellants further contend they were not required to exhaust any administrative remedies through the UCP process with respect to these claims.

#### *Applicable law*

A court may issue a writ of mandate to compel a public agency or officer to perform a mandatory duty. (*Ellena v. Department of Ins.* (2014) 230 Cal.App.4th 198, 205 (*Ellena*).) "This type of writ petition 'seeks to enforce a mandatory and ministerial

38.

duty to act on the part of an administrative agency or its officers.'" (*The H.N. & Frances C. Berger Foundation v. Perez* (2013) 218 Cal.App.4th 37, 46.) "'[T]he writ will not lie to control discretion conferred upon a public officer or agency.'" (*Ellena*, *supra*, at p. 205.)

Mandatory duties are often invoked in the context of ministerial acts. "A ministerial act is one that a public functionary ""is required to perform in a prescribed manner in obedience to the mandate of legal authority,"" without regard to his or her own judgment or opinion concerning the propriety of such act." (*Ellena*, *supra*, 230 Cal.App.4th at p. 205.) "In order to construe a statute as imposing a mandatory duty, the mandatory nature of the duty must be phrased in explicit and forceful language." (*Quackenbush v. Superior Court* (1997) 57 Cal.App.4th 660, 663.) However, "[w]hile a party may not invoke mandamus to force a public entity to exercise discretionary powers in any particular manner, if the entity refuses to act, mandate is available to compel the exercise of those discretionary powers in some way." (*Ellena*, *supra*, at p. 205.)

Thus, "'[i]n most cases, the appellate court must determine whether the agency had a ministerial duty capable of direct enforcement or a quasi-legislative duty entitled to a considerable degree of deference. This question is generally subject to de novo review on appeal because it is one of statutory interpretation, a question of law for the court.' [Citation.] 'Even if mandatory language appears in the statute creating a duty, the duty is discretionary if the [entity] must exercise significant discretion to perform the duty.'" (*Alejo v. Torlakson* (2013) 212 Cal.App.4th 768, 779–780 (*Alejo*).)

To state a cause of action for a writ of mandate, one must plead facts showing (1) a clear duty to act by the defendant; (2) a beneficial interest in the defendant's performance of that duty; (3) the defendant's ability to perform the duty; (4) the defendant's failure to perform that duty or abuse of discretion if acting; and (5) no other plain, speedy, or adequate remedy exists. (See *Elmore v. Imperial Irrigation Dist.* (1984) 159 Cal.App.3d 185, 193.)

*Discussion*

To petition for a writ of mandate, therefore, appellants must initially identify a clear, nondiscretionary duty on the part of the state-level defendants to act upon the facts alleged or an abuse of discretion in how they chose to act. In their opening brief, appellants first point to the general constitutional requirement that the state avoid discriminatory practices and provide equal access to educational services as one alleged ministerial duty. Under this claim, the state-level defendants were required to act upon notice of the alleged discriminatory impact of actions taken by the local-level defendants.

To the extent appellants seek to rely upon the state constitutional right to equal access to education, we have determined the facts stated do not support a claim. Thus, those same facts cannot demonstrate the state-level defendants had any ministerial or nondiscretionary duty to act. To the extent appellants rely on their continuing equal protection claim, we find this basis insufficient to support the requested writ. The underlying responsibilities of the state are broadly to ensure equal protection under the laws with respect to the fundamental right to education. The manner in which the state provides education to its citizens is a highly discretionary area and one not broadly amenable to a writ designed to dictate specific conduct. It is not surprising, then, that appellants point to no constitutional mandate to the state-level defendants to act in any particular way and, in our own research, we have found no such ministerial mandate either. Accordingly, the allegations that respondents were aware of disparate impacts and failed to act do not demonstrate that the state-level defendants failed to act in the face of nondiscretionary duties imposed by the law.[13]

---

[13] To the extent appellants claim there is a discretionary duty on the part of the state-level defendants to affirmatively act upon learning of the facts alleged, and that their failure to act is resolvable through a writ of mandate, we likewise reject their logic. We see no clear mandate in the law for the state to act at any particular moment upon learning of potential violations of the equal protection clause. Further, the fact that the state has set forth an administrative complaint procedure shows, at a minimum, that there is some discretionary authority in the state with respect to how and when to act to remedy claims of constitutional violations.

Second, appellants' opening brief argues the state-level defendants had a ministerial duty to act under Government Code section 11136 and its failure to do so is improper. Consistent with our conclusion concerning the equal access constitutional claim, however, we reject this claim on the basis that the facts asserted by appellants do not support a claim under the law as written. As such, they cannot support the writ cause of action.

Next, appellants rely upon allegations that federal law requires the state-level defendants to actively monitor equal access issues and prohibit discrimination under 20 United States Code section 1703(f) and 42 United States Code section 2000d. Appellants contend that these laws have been consistently construed "to impose a monitoring obligation as part of the obligation to establish minimum anti-discrimination standards and guidelines for the public schools they fund."[14]

The state-level defendants respond that the state has broad discretion in the manner in which it implements these requirements, a discretion shown by the fact that state law requires local agencies to gather and report the information required. The state-level defendants further rely on arguments that appellants do not have a beneficial interest in the data collection and failed to exhaust administrative remedies and, thus, had other remedies available.[15]

---

[14] Appellants' complaint lists several state law statutes potentially supporting the writ as well, including Education Code sections 14040, 51745, 58511 and former section 52886, along with the identification of several more code sections that appear to be directed solely at the local-level defendants. Although not raised in the opening brief, the state-level defendants discussed these in their responsive briefs. We have reviewed these statutes and find no basis for a writ of mandate claim against the state-level defendants within them.

[15] Although unclear as to which arguments it precisely applies, the state-level defendants also raise the allegation that appellants have since settled their lawsuit with the local-level defendants in a manner that resolves various portions of their claims against the state-level defendants. Such evidence, occurring after the court's rulings, is not part of the evidence before the trial court and, thus, not part of its reasoning. We decline to consider allegations concerning settlement for the first time on appeal.

In our review of the general legal framework of appellants' claim, we recognize that a valid claim could be made under this theory with appropriately pled facts. With respect to the existence of an enforceable duty to act and a beneficial interest in the completion of that duty, we find this case analogous to *California Hospital Assn. v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559 (*Maxwell-Jolly*). In *Maxwell-Jolly* the California Hospital Association sought a writ of mandate challenging the manner in which certain hospitals were being reimbursed for services tied to the federal Medicare laws. (*Id.* at p. 564.) The reimbursement payments were set based on a formula developed by the California Department of Health Care Services. The Department argued its rate-setting was a discretionary act that was not the proper focus of mandamus relief and that the California Hospital Association lacked any beneficial interest in the setting of reimbursement rates.

Both of these contentions were rejected. Although there was a discretionary aspect to the reimbursement rate determination, a writ of mandate could still issue if that discretion was abused. (*Maxwell-Jolly*, *supra*, 188 Cal.App.4th at p. 570.) Moreover, the concept of a beneficial interest in the appropriate conduct was much broader than what is necessary to maintain standing in a litigation. All that is required to demonstrate a beneficial interest is "'a special interest over and above the interest of the public at large.'" (*Id.* at p. 569.) Appellants' allegations in this case sufficiently allege an abuse of discretion in the nonperformance of required duties on the part of the state-level defendants. In addition, appellants have alleged a greater interest than the public at large in the performance of these duties, both as parents and students attending the schools in question and as community based organizations working to combat improper practices at these schools. We discuss both conclusions below.

Turning to the issues raised in this case, appellants point out that federal courts impose a ministerial duty upon state-level agencies to monitor their school systems for compliance with federal equal protection requirements under both 20 United States Code

section 1703(f), focusing on students with language barriers, and 42 United States Code section 2000d, covering the right to be free from discrimination generally. (See *Idaho Migrant Council v. Board of Ed.* (9th Cir. 1981) 647 F.2d 69, 70–71 [finding Idaho could not rely on fact that local districts were responsible for contested actions where state Constitution provided for supervision of state educational institutions and state provided oversight in educational matters].) As discussed with respect to the equal protection and equal educational opportunity claims, California's state-level constitutional and statutory duty to oversee the education process is well settled. California's acceptance of such oversight duties appears at least on par with the obligations triggering duties under the federal law in *Idaho Migrant Council*. Accordingly, we see no reason why the case law would not indicate a clear ministerial duty on the part of the state to monitor compliance with federal laws.

Recognizing such a duty exists, it is apparent that how one engages in monitoring for compliance with federal law, like how one sets rates for Medicare reimbursements, is discretionary in nature. Indeed, appellants point to no laws or cases stating any one specific method for monitoring compliance must be used. Accordingly, any claim arising from the way in which the state implements such a duty must demonstrate an abuse of discretion. The question thus becomes, to what degree must appellants allege the state-level defendants' actions constitute an abuse of discretion?

The state-level defendants point us to *Alejo*, *supra*, 212 Cal.App.4th 768. In *Alejo*, the plaintiffs sought a writ of mandate to compel compliance with the requirements of 20 United States Code section 1703(f), arguing that the discontinuation of on-site monitoring programs violated the statutory duty to take appropriate action to ensure compliance with the federal laws. (*Alejo*, *supra*, at p. 781.) The *Alejo* court disagreed that such contentions were sufficient to state a claim. Relevant to this case, the court reasoned that the ministerial duty to monitor was a broad duty and, therefore, a plaintiff must allege that the monitoring program in whole is sufficiently flawed such that its continued use

43.

constitutes an abuse of discretion. Allegations against a single component of that discretionary program will not suffice. (*Id.* at pp. 781–782.) The state-level defendants thus broadly contend that appellants simply cannot state an abuse of discretion mandamus claim where the failure is based not on the reporting system implemented as a whole, but upon the actions of certain local entities that failed to comply with their reporting responsibilities. We agree in principle.

Resolving this dispute, therefore, turns to the nature of appellants' allegations concerning the duty to monitor. Although appellants' third amended complaint is not perfectly clear with respect to allegations against the state-level versus the local-level defendants in its writ of mandate claim, upon review we find that appellants have stated a broad challenge to the state-level defendants' conduct sufficient to support their writ claim. Specifically, appellants allege that the local-level defendants failed to submit the data required of them for the 2011-2012 school year, yet the state-level defendants "have taken no action to procure that data and have failed to implement any program or process for ensuring that the data is accurately submitted to sanction KHSD or other districts that fail to do so." Thus, unlike *Alejo*, appellants are not contesting only one portion of the program. Rather, they are alleging that the state-level defendants, having a mandatory duty to monitor for compliance with federal law, have abused their discretion to do so by failing to implement any review of the program they implemented to ensure they are receiving the data necessary to meet their duty. This holistic attack on the state-level defendants' use of their discretion when implementing the law is the type of challenge contemplated by *Alejo* and is sufficient to state a claim.

The state-level defendants' attacks on the writ action do not end there, however, as they also claim that appellants were required to exhaust their administrative remedies through the UCP process in order to proceed with the writ claim. Although we found this argument persuasive with respect to the taxpayer cause of action, we do not reach the same conclusion with respect to the writ action. In order to require exhaustion of

44.

administrative remedies, those remedies must provide the complainant with relief. (See *SJCBC LLC v. Horwedel* (2011) 201 Cal.App.4th 339, 348–349 [exhaustion not required where the plaintiff could not initiate administrative proceedings].) With respect to the taxpayer claim, appellants could use the administrative complaint procedures to correct discriminatory practices undertaken by the local agency and thus obtain relief. However, the relief sought under the writ claim is of a different nature. Rather than changing conduct at the local level, the relief sought is a wholesale change in the monitoring process at the state level. We see nothing in the structure of the UCP that would allow for such relief if an administrative complaint were filed. Accordingly, we do not agree that exhaustion of that administrative remedy is required to bring the writ of mandate action at issue here.

For these reasons, we conclude appellants stated a claim for a writ of mandate in this case.[16]

## *Associational Standing*

With the substantive claims resolved, we turn to a limited standing issue raised by the parties. Appellants in this case consist of a number of parents, students, and community organizations interested in the practices occurring in KHSD. As to the claims moving forward following this appeal, an issue has been raised regarding the standing of at least one of these organizations—the Delores Huerta Foundation (DHF). Because there appears to be some confusion regarding the nature of appellants' assertions on this issue, we first identify the scope of the appeal on this point before reaching its merits. In this case, there are three organizational plaintiffs, DHF, the National Brotherhood Association (NBA), and Faith in Action Kern County (FIAKC). The trial court found

---

[16] The parties agree that appellants' requests for declaratory relief with respect to each claim rise and fall with the discussion of their merits. Thus, where we have affirmed the trial court's dismissal of claims, no declaratory relief exists on those causes of action. But where we have determined appellants have stated a proper claim against the state-level defendants, their requests for declaratory judgment should be reinstated.

45.

each had standing under the public interest exception to proceed with the writ of mandate claim, which was originally identified as the ninth cause of action, but is identified as the eighth cause of action in the third amended complaint.

In their opening brief, appellants state they are "appeal[ing] the ruling on the FIRST through EIGHTH causes of action in the [second amended complaint] *as to DHF*." (Italics added.) Accordingly, given our prior discussion on the merits, appellants' allegation limits the issue to DHF's standing to pursue an equal protection claim under the California Constitution.

Recounting the procedural history of the case, appellants acknowledge that a demurrer based on associational standing was also brought against NBA and FIAKC following the complaint. The court sustained the demurrer with respect to NBA and overruled it with respect to FIAKC. In this appeal, appellants make no arguments regarding NBA's standing, but do argue "in an abundance of caution" that FIAKC has standing. For their part, the state-level defendants make no counterargument regarding FIAKC, but do argue that both DHF and NBA lack associational standing.

For clarity, we confirm that the issues on appeal are limited to those affecting DHF. As the trial court overruled the demurrer as to FIAKC and respondents make no argument that FIAKC failed to demonstrate associational standing, we accept the parties' implicit acknowledgment that the trial court's ruling on the demurrer to the third amended complaint does not overrule its prior ruling regarding FIAKC's associational standing in this matter.

### *Applicable law*

"Under the doctrine of associational standing, an association that does not have standing in its own right may nevertheless have standing to bring a lawsuit on behalf of its members." (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1003.) "Associational standing exists when: '(a) [the association's] members would otherwise have standing to sue in their own right; (b) the

46.

interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" (*Id.* at p. 1004.)

### *Appellants' pleadings*

With respect to the nature of DHF as an organization and its member's injuries in this matter, appellants alleged that DHF is "a non-profit membership organization whose mission includes pursuing social justice through systemic and structural transformation and advocating for systemic change to ensure academic success for all students. Some of its members are parents of students or students who reside in KHSD who have been subjected or may in the future be subjected to disciplinary action …." Appellants further alleged that one "of DHF's current primary focuses is to address the high incidence of suspensions, expulsions, involuntary transfers and high dropout rates of African-American and Latino students in KHSD" and provided examples of DHF's past actions in this area. Appellants concluded by reciting the three requirements for associational standing with respect to DHF.

### *Discussion*

Despite appellants' pleadings generally satisfying the standards set forth above with respect to DHF, the state-level defendants assert the court correctly found there was no organizational standing because DHF failed "to allege specific facts that establish standing for all causes of action" and by alluding to a lack of affidavits on the issue. We do not find these arguments compelling. At the demurrer stage, we treat all properly pleaded facts as admitted and can rely upon those facts to determine the correctness of the trial court's ruling, including with respect to standing. (See *Market Lofts Community Assn. v. 9th Street Market Lofts, LLC* (2014) 222 Cal.App.4th 924, 930–932 [relying upon facts pled in complaint to support standing to sue].) Appellants have properly pled that DHF members are affected by the allegedly discriminatory actions taken by KHSD, that the organization's mission consists of remedying such actions and otherwise

improving the local school districts, and that none of the individual members are needed to pursue the organization's claims.  This is sufficient to survive the demurrer.

## DISPOSITION[17]

The judgment of the trial court is affirmed in part and reversed in part.  As discussed above, we conclude appellants have stated a claim under California's equal protection clause utilizing a disparate impact theory and properly sought a writ of mandate based on the state-level defendants' alleged failure to meet their federally mandated monitoring requirements.  The trial court thus incorrectly granted demurrers as to these causes of action and any related requests for declaratory relief.  The trial court also incorrectly determined that DHF lacked associational standing.  In all other respects, the trial court's order is affirmed.

_____

MEEHAN, J.

WE CONCUR:

_____

DETJEN, Acting P.J.

_____

SMITH, J.

---

**17**    Appellants' briefing raises a dispute concerning the trial court's decision to take judicial notice of certain documents submitted with respondents' demurrer to the complaint.  They admit, however, that the trial court did not expressly rely on any of these documents in its ruling.  For their part, respondents claim judicial notice was proper and that the documents demonstrated the falsity of appellants' allegations that respondents did nothing in response to the disclosure of disparate impacts in discipline and provided relevant facts related to appellants' use of the UCP.  Our review of the issues does not turn on whether these documents were before the trial court or whether they properly could be considered on demurrer.  We therefore do not reach this dispute.